**STATE of Tennessee, Appellant,**

v.

**Nealy Walter PERRY, Appellee.**

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 26, 1987.

Permission to Appeal Denied by Supreme Court Nov. 30, 1987.

W.J. Michael Cody, Atty. Gen., Jerry L. Smith, Deputy Atty. Gen., Tom Thurman, Mark Beveridge, Asst. Dist. Attys., Nashville, for appellant.

David L. Raybin, Edward M. Yarbrough, Hollins, Wagster & Yarbrough, Joe P. Binkley, Sr., Nashville, for appellee.

## OPINION

LLOYD TATUM, Special Judge.

The defendant, Walter Nealy Perry, was convicted of first degree murder and sentenced to life imprisonment. The trial judge granted a motion for a new trial on defendant's application, after a finding that one of the jurors received extraneous information. The State has appealed from the judgment granting a new trial assigning issues that the trial judge abused his discretion. After considering the issue, we affirm the judgment of the trial court.

This appeal was granted pursuant to Rule 9, T.R.A.P. The appellant says that the appeal was improvidently granted by this court and moved that the appeal be dismissed. The defendant insists that the State may not appeal from an order granting a new trial, citing several cases that were decided before the adoption of the Rules of Appellate Procedure, now in force. Under our former practice, interlocutory appeals were not permitted; however, they are now permitted pursuant to Rule 9 and Rule 10, T.R.A.P.

Rule 9(a), T.R.A.P., provides:

"[i]n determining whether to grant permission to appeal, the following, *while neither controlling nor fully measuring the courts' discretion,* indicate the character of the reasons that will be considered: (1) the need to prevent irreparable injury, giving consideration to the severity of the potential injury, the probability of its occurrence, and the probability that review upon entry of final judgment will be ineffective; (2) the need to prevent needless, expensive and protracted litigation, giving consideration to whether the challenged order would be a basis for reversal upon entry of a final judgment, the probability of reversal, and whether an interlocutory appeal will result in a net reduction in the duration and expense of the litigation if the challenged order is reversed; and (3) the need to develop a uniform body of law, giving consideration to the existence of inconsistent orders of other courts and whether the question presented by the challenged order will not otherwise be reviewable upon entry of final judgment." (Emphasis supplied)

■ It is noted that this court may exercise its discretion for reasons not specifically stated in the foregoing rule. However, under the reason first given in Rule 9(a), we must consider the probability that review upon entry of final judgment in a second trial will be ineffective if the result of a second trial is different from that of the first. Further, we are mindful that a second trial would result in the needless expense of the second trial. We hold that the determination of whether to grant an interlocutory appeal pursuant to Rule 9 and Rule 10, T.R.A.P., is discretionary with this court when the State desires an interlocutory appeal from a judgment granting a defendant a new trial. We do not find that this appeal was improvidently granted. The motion to dismiss is overruled.

In the issue presented by the State, it is asserted that the trial court abused its discretion in granting a new trial based on allegations of jury misconduct. We will summarize evidence heard on the defendant's motion for a new trial.

Mr. Lonnie Phelps testified that he was a witness for the State in the trial of this case. While Mr. Phelps was standing outside the courtroom waiting to testify, Keith Hammers, husband of Deborah Hammers, a juror in the trial of this case, approached Mr. Phelps and told him that the defendant was a sorry S.O.B. Mr. Hammers told Mr. Phelps that he had had trouble with the defendant before; that the defendant had worked on his mother's car when he was a "kid" and overcharged his mother. Mr. Phelps testified further that Mr. Hammers told him that he had tried to "run over" the defendant in his mother's car. Mr. Hammers further told Mr. Phelps that his wife was on the jury and that he was going to tell his wife to find "the son of a bitch guilty."

The next day, while the trial was still in progress, Mr. Hammers again approached Mr. Phelps and told Mr. Phelps that he had talked to his wife and that the jury "already decided he's guilty." Mr. Hammers said to Mr. Phelps that the jury was "just waiting to hear your (Mr. Phelps's) testimony."

Linda Lou Phelps, testified that she was the wife of Lonnie Phelps and that she was also a witness for the State in this case. She testified that she observed her husband and Mr. Hammers conversing, but she did not overhear any of the conversation.

Mr. Keith Hammers testified that the defendant and his mother had a "run-in with an alternator problem" about 1973 or 1974, when Mr. Hammers was 16 or 17 years of age. Mr. Hammers testified that he saw the defendant shortly afterward when there was "somewhat" of physical contact between him and the defendant about the repair job. The defendant threatened Mr. Hammers and said that he was going to take the alternator off the car. When the defendant came "around to do that" Mr. Hammers drove his mother's car away. He thought that the defendant told him "I'll kill you." Mr. Hammers testified that before the trial began, he thought that the defendant was guilty.

Mr. Hammers admitted that he gave the foregoing information to Mr. Phelps and told Mr. Phelps that he was going to speak to his wife about it. He testified that he did not in fact talk with his wife about his problem with the defendant and that when he talked with Mr. Phelps, he was just "running off at my mouth." However, he admitted that he told Mr. Phelps that his wife had told him during trial that the defendant was guilty.

Mr. Hammers stated that on Monday night, he and his wife were having dinner, when he said to his wife, "Well is he guilty or not?" His wife responded: "The way it looks he is, but I can't talk about it." His wife told him to "shut up" before the children started talking. Mr. Hammers also told his wife that Mr. and Mrs. Phelps were going to be witnesses in the case. He denied telling his wife that he knew the defendant. He said that he came back the second day and told Mr. Phelps that he had talked with his wife because he thought that was what Mr. Phelps wanted to hear. Mr. Hammers further testified that in the conversation with his wife, when he mentioned talking to Mr. Phelps, his wife told him, "I don't even want to hear it." Mr. Hammers thought that this conversation took place on the second day of the trial.

Ms. Deborah Hammers testified that she learned from her husband after the trial that he had a conversation with Mr. Phelps. She testified that her husband did not tell her the substance of the conversation.

She testified that at dinner on the day she was selected to be on the jury, her children were asking her about court procedure. She stated that her husband might have asked her if she felt the defendant was guilty and she told him that she did not know. She might have said that he "might have been guilty" at a later time during the trial. She told her husband that she had rather not discuss this case. She did not know what was being said when she told her husband that she did not desire to discuss the case, but probably it was something about the case.

It was not until after the trial that Ms. Hammers learned about the difficulty between the defendant and her mother-in-law concerning the alternator.

The record further reveals that Mr. Phelps did not report the conversations with Mr. Hammers until several days after the trial was completed. The jury was not sequestered but the jury was properly admonished to refrain from discussing the case.

The trial judge, upon the above-summarized evidence, found that the defendant did not receive a "fair trial," and granted a motion for a new trial. The trial judge found from circumstantial evidence that Mr. Hammers related prejudicial information to Mrs. Hammers.

In *State v. Blackwell,* 664 S.W.2d 686 (Tenn.1984), the Supreme Court reviewed many of our older cases holding that when jurors are sequestered, the unexplained separation of one of the jurors created a presumption that the juror might have been tampered with. Under these circumstances, "it was not incumbent on the defendant to show affirmatively that he was prejudiced by the improper influence received by the jury" and a presumption of prejudice was invoked. *Id.* page 689. Also see *Gonzales v. State,* 593 S.W.2d 288 (Tenn.1980).

In the *Blackwell* case, the Supreme Court discussed the rule with respect to a non-sequestered jury as authorized by T.C.A. § 40–18–116. The Court said:

"We agree with the Court of Criminal Appeals that something more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice. That additional requirement is that as a result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors."

█ In view of the above-summarized testimony of Mr. Hammers and his wife, we think that the burden of proof was on the State to show that there was no extra-

neous prejudicial information or outside influence. A *prima facie* showing was made and not refuted by the State. The testimony of Mr. Hammers sharply conflicted with that of Mrs. Hammers, but both of them admitted that there was some conversation about whether the defendant was guilty; this, coupled with Mr. Hammers' expressed anxiety for the defendant to be convicted and his inclination to discuss the case, is sufficient circumstantial evidence to support the trial court's finding. Misconduct of a jury may be established by circumstantial evidence. *State v. Blackwell, supra.* The findings of the trial judge, if supported by the evidence, are conclusive on appeal. *State v. Johnson,* 661 S.W.2d 854 (Tenn. 1983).

The State insists that because of the overwhelming evidence of the defendant's guilt, this error did not affect the judgment. We have reviewed the record and agree that the evidence of the defendant's guilt is overwhelming. Rule 36(b), Tenn.R. App.P., provides:

> "Rule 36. Relief; Effect of Error.—(b) Effect of Errors.—A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment *or would result in prejudice to the judicial process.*" (Emphasis supplied)

In the comment accompanying this rule, the Advisory Commission stated, in part:

> "This rule also differs from existing law insofar as it requires reversal of a judgment when affirmance would be prejudicial to the judicial process. Although this concept cannot be fully defined, it certainly would include situations in which, for example, an accused was denied the effective assistance of counsel, or the decisionmaker was obviously biased, or there was improper discrimination in jury selection."

Without the retention of the integrity of jurors, our jury system would collapse. It is imperative that courts remain very sensitive with regard to possible misconduct of jurors if our present system of jurisprudence is to be preserved. We are satisfied that the conduct of Mr. and Mrs. Hammers resulted in prejudice to the judicial process, requiring a new trial even though the misconduct probably did not alter the result of the trial. See *State v. Onidas,* 635 S.W.2d 516 (Tenn.1982).

The judgment of the trial court awarding the defendant a new trial is affirmed. This case is remanded for trial.

DUNCAN and SCOTT, JJ., concur.