**STATE of Tennessee, Appellee,**

v.

**Deborah Mae FURLOUGH, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

April 10, 1990.

Permission to Appeal Denied by Supreme Court July 23, 1990.

G. Michael Robbins, Goodlettsville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Linda Ann Hammond, Asst. Atty. Gen., Nashville, Lawrence Ray Whitley, Dist. Atty. Gen., Gallatin, for the State.

## OPINION

WADE, Judge.

The defendant, Deborah Mae Furlough, was convicted of first degree murder in the firearm slaying of her husband, Tim Furlough; unlawful use of a firearm in the commission [1] of a felony; and the unlawful disposition of a body. A Range I offender, she received sentences of life, three, and three year sentences, respectively.

The defendant presents eleven issues in this appeal:

(1) Whether a statement she made to a detective should have been suppressed because it was taken in violation of her fifth amendment right to counsel.

(2) Whether a motion to dismiss the indictment charging her with the unlawful disposition of a body was improperly overruled.

(3) Whether the charge of unlawful disposition of a body should have been severed from the rest of the counts.

(4) Whether *voir dire* was improperly limited.

(5) Whether the jury should have been sequestered.

(6) Whether the introduction of photographs of the victim prejudiced the trial.

(7) Whether a hearsay statement made by the co-defendant was properly admitted into evidence.

(8) Whether the trial court erred in excluding evidence of prior violent acts of the deceased against third persons.

(9) Whether the trial court improperly excluded expert opinion testimony as to the defendant's state of mind at the time of the shooting.

(10) Whether certain requested jury instructions were improperly refused.

(11) Whether a motion for new trial on the grounds that defendant was denied an impartial jury should have been granted.

The conviction for the unlawful disposition of a body is reversed and dismissed; the remaining convictions are reversed and remanded.

With the exception of the circumstances surrounding the defendant's confession, the facts are not in substantial dispute. The defendant argued that at the time she shot her husband, she believed that both she and her daughter were in impending danger of death or serious bodily injury from the victim. The state contended that the murder was premeditated and without justification.

On the day of the shooting, the defendant, her cousin Mary Sue Scott,[2] and the victim borrowed a pickup truck from Scott's father in order to move the victim from Adolphus, Kentucky, to Nashville. The defendant and her daughter were to join him later. After travelling a short distance, the victim changed his mind about moving. Near Portland, Tennessee, the three purchased some beer and drove to a remote fishing area near the Tennessee/Kentucky line.

---

**1.** The unlawful use of a firearm in the commission of a felony is not a separate offense. The defendant's conviction should have been for first degree murder by the use of a firearm, with punishment fixed at life imprisonment, enhanced by a consecutive sentence of five (5) years for the weapon violation. The three (3) year sentence imposed is also error; the enhancement is five (5) years. *See State v. Hudson,* 562 S.W.2d 416 (Tenn.1978).

**2.** Scott was a co-defendant on the count charging unlawful abandonment of a body. Her trial was severed. Pursuant to a plea agreement, she received a two-year suspended sentence in exchange for her truthful testimony at the defendant's trial.

While the defendant and her cousin began to gather wood for a fire, the victim sat on the tailgate of the truck. The defendant stood up, took a rifle from the truck, and shot the victim in the chin. Scott, who was building a fire, turned to see the victim lying wounded on the ground; the defendant was trying to unjam her rifle. She then observed the defendant run to the truck and take a pistol from under the driver's seat. While not in a position to see, Scott heard the defendant fire a second time.

After the victim's clothes were removed, Scott helped the defendant bury the body in some sand and gravel a short distance away. Scott said that the defendant instructed her to move the fire to where the victim lay when he was shot so as to conceal the blood. On their return to Kentucky, the defendant told Scott not to discuss the shooting and concocted a story to cover the disappearance of the victim. Two days later the body was found and the matter was reported to the Sumner County Sheriff's Department.

The medical examiner determined that either shot would have been fatal. Both wounds revealed stippling, which occurs when a gun is discharged within twelve inches of the skin. The stipple patterns indicated that the gun had been discharged between one to four inches from the bullets' points of entry. The examiner confirmed that two different weapons were used.

The defendant testified in her own behalf. Shortly after her separation from her first husband, she began dating Tim Furlough. They lived together for a period of time but separated following a violent argument. Afterwards, the defendant learned she was pregnant, reconciled with the victim, and moved to her parents' home in Adolphus, Kentucky. They did not marry and slept in separate bedrooms.

Two months after moving into the house, the victim became angry with the defendant and her mother, cursed them, and turned over furniture. When the victim expressed his regrets over the incident, there ensued a second reconciliation.

There were apparently numerous violent incidents between the defendant and the victim during the course of their relationship. In most instances, the victim would assault the defendant, both verbally and physically, and later apologize for his outbursts. None of the defendant's injuries required medical attention. We note that eyewitness testimony corroborated three of the victim's violent acts against the defendant.

The victim became less violent for a short time after the defendant gave birth to a daughter. After the victim married the defendant, however, he reinstituted his abusive conduct. On several occasions, the victim forcibly removed the defendant's clothes in an attempt to have sex with her. He once attempted to smother her with a pillow and at another time placed a knife to her throat. The defendant testified that the victim awakened her on one occasion by holding a heated coke bottle top against her with a pair of pliers. The victim physically abused the child and once crushed a cigarette out on his daughter's forehead "to give her something to cry about."

The defendant testified that on the day before the fatal shooting, she awoke to see the victim on the couch with their daughter, who wore nothing but her shirt. He was on his knees with his penis erect. He held the child's legs apart. When he saw the defendant, the victim knocked her back on the bed and asked if she wanted to "live or die."

She testified that just before the shooting, the victim said "[w]hat you accused me of I'm going to do and you're going to watch and you're going to like it. If you don't want to watch, I'm going to whoop your ass and make you watch." A short time later, the victim said "I'm going to beat your ass and I'm going to make you watch and I'm going to beat you so much you're going to get to where you like it." He rubbed an open knife on the defendant's thighs.

The defendant contended that, at the moment she pulled the trigger, she was thinking of the safety of her child and expressed

her belief that the victim intended to kill her.

The sufficiency of the evidence is not at issue.

## I

The defendant initially contends that a statement she gave to a Sumner County Sheriff's Department detective was taken in violation of her fifth amendment right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). She argues that, during an interrogation at her parent's house, she invoked her right to an attorney; she asserts that the investigating officer failed to honor that right at a subsequent custodial interrogation. After a pretrial hearing on the matter, the trial court overruled the motion to suppress on the basis that the defendant had voluntarily waived her previous request for counsel.

Shortly after noon on the day following the discovery of the corpse, Detective George Farmer of the Sumner County Sheriff's Department drove to Kentucky to interview the defendant at her parent's home. As they entered, the defendant said, "Tell me it's not true."

The detective asked the defendant's parents to leave the room while he and two other officers present spoke to the defendant. She was advised of her *Miranda* rights, and told a story similar to the one Mary Sue Scott had initially given authorities and then recanted. The officer told the defendant that Scott had been arrested after she gave a second statement implicating the defendant in her husband's murder. As Detective Farmer read Scott's statement, the defendant told him that her husband had threatened to sexually abuse her eleven year old sister. She implied that her husband was abusing their daughter. When she said that "maybe she ought to talk to an attorney," the detective immediately terminated the interview. He asked the defendant to meet him at the Sumner County Sheriff's Department around 3:00 P.M. that afternoon.

The defendant had her father drive her to this state, arrived at the sheriff's depart-ment at 2:45 P.M., and waited approximately 25 minutes before being taken into Detective Farmer's office. The detective re-advised her of her rights and she signed a waiver form. The defendant admitted using a rifle and a pistol to kill her husband. She told of burning his pants in a trash barrel at her house. She expressed her fear of her husband at the time of the shooting. She claimed that the victim attempted to have sex with his infant daughter.

It is apparent that from the time the defendant arrived at the sheriff's office she was in custody.

The trial court's relevant findings of fact were that the interview at defendant's parent's house was a non-custodial interrogation; when she invoked her right to counsel, the questioning stopped; the defendant voluntarily came to the sheriff's department with her father pursuant to the officer's request; and during the time between the detective's departure and defendant's arrival at the police station, the defendant had the opportunity to contact an attorney but chose not to do so. The trial court held that the defendant, after being taken into custody in Tennessee, had waived her right to counsel before she made the incriminating statement; it concluded that the statement was voluntary.

In *Miranda*, the United States Supreme Court determined that the fifth amendment required authorities to advise those in custody of the right against self-incrimination and the right to the presence of an attorney during questioning. If the accused stands upon his right to silence, the interrogation must cease. If there is a request for counsel, the interrogation must cease until an attorney is present. 384 U.S. at 474, 86 S.Ct. at 1627.

The Court clarified the procedure in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981):

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initi-

ated custodial interrogation even if he has been advised of his rights.

*Id.* at 484, 101 S.Ct. at 1884–85 (footnote omitted).

[A]n accused ... having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. at 1885. *See State v. Goforth,* 678 S.W.2d 477 (Tenn.Crim. App.1984).

■ Detective Farmer clearly treated the defendant's initial response as an invocation of her right to an attorney. The trial court agreed. In *Pittman v. Black,* 764 F.2d 545, 546 (8th Cir.1985), the court found that "perhaps [I] should talk to an attorney" was an invocation of the right to counsel. It is our assessment that the defendant, despite an equivocal assertion, invoked her right to counsel.

The second question is whether the defendant was in custody when she invoked her right to counsel, whether she was "deprived of her freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

The defendant contends that the trial court erroneously concluded that she was not in custody at the time she asserted her right to counsel. We are bound by the trial court's findings of fact unless it "clearly appear[s] that there ha[s] been an abuse of discretion and a violation of the rights of the accused." *Childs v. State,* 584 S.W.2d 783, 788 (Tenn.1979); *see State v. Nakdimen,* 735 S.W.2d 799, 802 (Tenn.Crim.App. 1987).

The test to be applied is whether a "reasonable man in the suspect's position" would have believed himself to be "in custody." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). Our Supreme Court has used the terms accusatory and custodial stages interchangeably, yet acknowledges its "hairline" distinction with the investigatory stage. *Childs v. State,* 584 S.W.2d at 788.

In *State v. Morris,* 224 Tenn. 437, 456 S.W.2d 840 (1970), the totality of the circumstances governed the classification of interrogation:

(1) The nature of the interrogator.
(2) The nature of the suspect.
(3) The time and place of the interrogation.
(4) The nature of the interrogation.
(5) The progress of the investigation at the time of the interrogation.

*Id.* at 443; 456 S.W.2d at 842.

The trial court's conclusion that defendant was not in custody during this interrogation was based on the fact that defendant's parents were in the next room while other relatives were waiting outside the house; the defendant was not threatened or pressured in any way; and she was advised of her rights. In short, the trial court found the environment was not coercive.

■ Whether a person is in custody does not turn on whether the interrogation took place in a "coercive environment" but whether the suspect was "deprived of his freedom of action in any significant way." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). On the other hand, because a person is interrogated in her own home does not automatically mean that the person is not in custody. *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Here, after visiting the house and talking with her father the night before, two officers came back to the defendant's parent's house to continue their investigation. The defendant was certainly the primary suspect. The officers read the warning of rights required by *Miranda* and confronted the defendant with Scott's accusation. The fact that the defendant's parents were cleared from the room is of significance. In *United States v. Beraun–Panez,* 812 F.2d 578, *modified* 830 F.2d 127 (9th Cir. 1987), the Ninth Circuit held that keeping the defendant isolated from others is a factor indicative of custodial interrogation.

The investigation had focused on the defendant as the prime suspect in her hus-

band's murder. Scott's statement had established the elements of a criminal offense. The defendant was confronted with the allegation and given the opportunity to explain. Yet the defendant lived in Kentucky. The crime occurred in Tennessee and was under investigation by officers from this state. The detective asked rather than directed the defendant to turn herself in.

That Detective Farmer would have "left that house and still asked Deborah Furlough to come down at 3:00 or thereabouts ... if she had given a full-fledged statement to her participation in the murder" is of little consequence. This fact was not communicated to the defendant. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *McCarty*, 468 U.S. at 442, 104 S.Ct. at 3151.

■ Whether the initial questioning was investigative or accusatory is a close issue under these peculiar facts. For purposes of analysis, however, we will assume that the defendant was in custody and the investigation had reached the accusatory stage. This does not, in our view, alter our conclusion that the confession made after the defendant's arrest in Tennessee is admissible.

We next consider whether the defendant was in continuous custody and whether any break in that custody nullified her initial request for counsel.

Several cases outside of this jurisdiction deal with the issue of fifth amendment protection from interrogation after the defendant has been released from custody. *See Dunkins v. Thigpen*, 854 F.2d 394 (11th Cir.1988); *McFadden v. Garraghty*, 820 F.2d 654 (4th Cir.1987); *United States v. Skinner*, 667 F.2d 1306 (9th Cir.1982); *People v. Trujillo*, 773 P.2d 1086 (Colo. 1989); *Gonzalez v. State*, 449 So.2d 882 (Fla.App.1984); *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989); *State In Interest of Wells*, 532 So.2d 191 (La.App.1988); *Brown v. State*, 661 P.2d 1024 (Wyo.1983).

Each of these cases held that a prior request for counsel did not preclude further police initiated questioning after the defendant had been released from continuous custody. In *Dunkins*, the 11th Circuit distinguished *Edwards* in instances where the break in custody is neither contrived or pretextual:

> [A] break in custody dissolves a defendant's *Edwards* claim. If the police release the defendant, *and if the defendant has a reasonable opportunity to contact his attorney*, then [there is] no reason why *Edwards* should bar the admission of any subsequent statements. A break in custody after the invocation of fifth amendment rights ends the need for the *Edwards* rule. (Emphasis added.)

*Dunkins*, 854 F.2d at 397.[3]

Each case must be judged on its particular facts. Whether a defendant had an opportunity to contact his attorney must be examined in terms of reasonableness. The defendant here had at least two and one-half hours in which to contact an attorney before she left her meeting with Detective Farmer. She had not previously been charged with a crime and knew no attorney who could represent her. She faced criminal charges in Sumner County, a forty-five minute drive from her house in Adolphus, Kentucky. The break in the custodial chain was relatively short. While none of the opinions touching on this issue has applied the continuous custody requirement to a period of time less than 12 hours, time is not the only factor. *See United States ex rel. Espinoza v. Fairman*, 813 F.2d 117, 125, n. 6 (7th Cir.1987).

In this instance, an important fact is that the defendant was not compelled to drive to Tennessee. Although extradition was never a consideration in this case, the fact is that the defendant exercised independent judgment after a reasonable time for reflection when she chose to honor the officer's request to travel to this state. Despite the opportunity, she chose not to talk with an attorney. That she ultimately

---

**3.** This court recently adopted the continuous custody requirement in *State v. Steve Kyger*, 787 S.W.2d 13 (Tenn.Crim.App., 1989) (application for permission to appeal denied).

chose to voluntarily turn herself in, waive her *Miranda* rights, and make a statement (not inconsistent with her trial defense) without the benefit of counsel are indicative of a break in custody. Even if the initial interview was in a custodial setting, we think these circumstances establish the break required to dissolve the *Edwards* claim.

The issue is, therefore, without merit.

## II

■ The trial court overruled the defendant's motion to dismiss that portion of the indictment charging her with unlawful abandonment of a body.

Count four provided as follows:

And the Grand Jurors aforesaid, on their oath aforesaid, do further present and say that the said DEBORAH MAE FUR-LOUGH ... heretofore on or about the 6th day of September, 1987, in the County and State aforesaid, did unlawfully, willfully and unnecessarily, and in an improper manner, abandon the body of Leonard D. Furlough by burying his body in a shallow grave and leaving it there without notifying anyone, against the peace and dignity of the State of Tennessee. 39–6–702.

/s/ Lawrence Ray Whitley

Defendant specifically contends that the indictment failed to allege the place the body was abandoned, an element of the offense. The state's position is that the allegation was not necessary.

In *State v. Vestal*, 611 S.W.2d 819 (Tenn. 1981), our Supreme Court held that "*place* is an essential element of an offense under T.C.A. § 39–2102 ...*"

While the general rule is that an indictment is not required to allege where the offense was committed, an exception is made when place constitutes a material element of the crime. Tenn.Code Ann. § 40–13–208. *State v. Donaldson*, 50 Tenn. 48 (1870); *See Jordan v. State*, 156 Tenn. 509, 514–15, 3 S.W.2d 159, 160 (1928).

In *State v. Smith*, 612 S.W.2d 493 (Tenn. Crim.App.1980), our court held as follows:

The test for the sufficiency of an indictment is whether it contains the elements of the offense intended to be charged; sufficiently apprises the defendant of what he must be prepared to meet; and in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Id.* at 497; *See State v. Morgan*, 598 S.W.2d 796, 797 (Tenn.Crim.App.1979).

Because the indictment is insufficient, count four must be dismissed.[4]

■ The defendant also contends that the trial court's instructions were incomplete:

Any person who willfully and unnecessarily and in an improper manner indecently exposes, throws away, or abandons any human body or the remains thereof in any public place or in any river, stream, pond or other place is guilty of a felony.

For you to find a defendant guilty of this offense the state must have proven beyond a reasonable doubt that the defendant did unlawfully abandon the body of Leonard D. Furlough by burying his body in a shallow grave and leaving it there without notifying anyone and that the defendant acted willfully, unnecessarily, and in an improper manner and indecently.

The defendant's requested instruction read:

Any person who willfully and unnecessarily, and in an improper manner, indecently exposes, throws away, or abandons any human body, or the remains thereof, in any public place, or in any river, stream, pond, or other place where the abandonment of the dead body would be likely to offend the public's sense of decency and morals and to expose the public to danger of contagious diseases or contamination of the water supply [is guilty of a felony]. It is not any place that such an abandonment would consti-

---

**4.** Count four charges the statutory felony not the common law misdemeanor of indecent buri-

al of a body. *See Vestal*, 611 S.W.2d at 822 (Drowota, J. dissenting).

tute this offense, but rather a place that poses the likelihood of exposing the public to offensive sights and the danger of contagious diseases, or contamination of the water supply.

The state contends that the proposed instruction unnecessarily expands the definition of "public place" and that the word "public" is a term of common understanding not in need of definition. It argues that the trial court's charge was substantially the same as that requested by the defendant.

In *State v. Bryant,* 654 S.W.2d 389 (Tenn.1983), our Supreme Court held that:

[A] requested instruction may be unnecessary if the judge's main charge fully and fairly states the applicable law.... A criminal defendant has no right to have redundant instructions charged at his trial. Nor does he have a right to have irrelevant instructions charged. But *he does have a right to instructions which state all the applicable law* ...

*Id.* at 390. (Citation omitted, emphasis added.)

Tenn.Patt.Jury Inst. § 19.02 is incomplete; *Vestal* establishes that it fails to include "an essential element of [the] offense" in that the place where the body was abandoned was either *a public place* "where the disposal or abandonment of a dead body would be likely to offend the public's sense of decency and morals" or *any other place* likely "to expose the public to danger of contagious diseases or contamination of the water supply." *Vestal,* 611 S.W.2d at 822. (Emphasis added.)

The state argues that the error was harmless because the victim was buried in an area so well travelled he was found within two days by casual passersby; for that reason and because the burial site was near a graveyard, the state submits that it must have been "public."

Detective Farmer and the defendant testified that the area was "remote." The exhibits support that testimony. There was little evidence that the body was located in a public place or any other place exposing the public to danger. In our view, the jury should have received the more complete instruction.

The defendant may nonetheless be retried on this offense if re-indicted by the grand jury. The evidence established that the body was abandoned in close proximity to a body of water. If properly charged, the jury might determine whether the body was abandoned in a place likely "to expose the public to danger of contagious diseases or contamination of the water supply." *Vestal,* 611 S.W.2d at 822; *See State v. Campbell,* 641 S.W.2d 890 (Tenn.1982).

## III

Defendant contends that count four of the indictment, charging unlawful abandonment of a body, should have been severed from the first degree murder and firearm charges. She argues that the unlawful abandonment charge was not based upon the same conduct and did not arise from the same criminal episode as that of the other two counts.

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides for the joinder of offenses in a single indictment if the offenses constitute part of a common scheme or plan or if they are of the same or similar character. Rule 14(b)(1) provides that if two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and evidence of one would be admissible upon the trial of the others. *State v. Myers,* 764 S.W.2d 214, 216 (Tenn.Crim. App.1988). It is within the trial court's discretion whether to grant a severance of offenses.

The state's theory was that the defendant murdered her husband and disposed of his body as a part of a common plan. Concealment of the victim's body tends to show the guilt of the accused on the offense of murder. *State v. Chambless,* 682 S.W.2d 227, 231 (Tenn.Crim.App. 1984). Evidence of the victim's death is an element of the offense of unlawful abandonment.

The motion for severance was, in our view, properly denied.

This issue is without merit.

## IV

■■■ The defendant contends the trial court committed error when it denied her motion for individual *voir dire* of the prospective jurors.

After the trial judge conducted a general *voir dire*, the defendant was permitted to question prospective jurors in smaller groups regarding their exposure, both through personal experience and the media, to domestic violence. The prospective jurors not eliminated during the selection process were subject to further *voir dire* on their ability to impartially determine the defendant's guilt or innocence. *See State v. Caruthers*, 676 S.W.2d 935 (Tenn.1984). The defendant contends that she was entitled to question jurors individually regarding their knowledge of or experience with domestic violence.

In Tennessee, individual *voir dire* of witnesses is required "whenever there is believed to be a significant possibility that a juror has ... been exposed to other potentially prejudicial material with respect to his exposure." *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975); *State v. Claybrook;* 736 S.W.2d 95 (Tenn.1987); *See* Tenn.R.Crim.P. 24(a). The rule is "calculated to guarantee that right of the defendant to trial by a fair and unbiased jury." 736 S.W.2d at 100.

In *Claybrook*, for example, the court held that the trial court should have allowed individual *voir dire* of the jurors when 80% of the prospective jurors had heard about the case and two members of the panel had heard that the defendant had previously been incarcerated. *Id.*

The question in this case is whether any exposure to or knowledge of domestic violence deprived the defendant of a fair and impartial jury. The record establishes that many prospective jurors were aware of instances of domestic violence. None, however, admitted any exposure to the type of prejudicial information about this case which would have warranted individual *voir dire.*

We are, therefore, unable to discern any possible prejudice that resulted from the denial of individual *voir dire.*

There is no merit to this issue.

■■■ The defendant also complains that the trial court erroneously limited *voir dire.* During the small group questioning of the venire, the trial court qualified certain of defense counsel's questions.

In *State v. Irick*, 762 S.W.2d 121 (Tenn. 1988), the Supreme court held as follows:

It is the duty of the trial judge to participate in the examination of prospective jurors. The conduct of *voir dire* examination in a criminal prosecution is entrusted to his discretion. Tenn.R.Crim.P. 24. His actions in the conduct of voir dire will not be disturbed unless there is an abuse of that discretion.

*Id.* at 125; *See State v. Jefferson*, 529 S.W.2d 674 (Tenn.1975).

Many of the defendant's inquiries were vague. Several juror's responded that they did not entirely understand the questions. The trial court rephrased the questions in an apparent effort to determine whether the prospective jurors could retain an open mind.

■■■ After the first four prospective jurors had been examined collectively, the trial judge instructed defense counsel not to ask the next group whether they had consulted a psychiatrist or psychologist. Instead, the trial court instructed counsel to merely ask whether anyone had any notions about psychiatrists or psychologists which would interfere with their ability to be fair and impartial. The trial court was obviously concerned that such a direct question would cause prospective jurors embarrassment. In our opinion, this did not unduly limit the defendant's *voir dire.*

We find no error.

## V

Defendant next contends that the jury should have been sequestered.

Historically, both the state and federal constitutions required sequestration of juries. *See Recent Developments,* 48 Tenn.L.Rev. 146, n. 10–14 (1980). In 1965, our General Assembly passed a law permitting a waiver of the right:

> In all criminal prosecutions except those in which a death sentence may be rendered, the judge of the criminal court may, in his discretion, with the *consent of the defendant,* and with the consent of the district attorney general, permit the jurors to separate at times when they are not engaged upon the actual trial or deliberation of the case.

Tenn.Code Ann. § 40–18–116.

This exchange occurred before the jury selection process began:

> THE COURT: The jurors who are remaining up here, if you will move over to this side I would appreciate it so I can talk to you. We will begin our trial, and we anticipate that this trial will last from three days to a week. So, you'll need to have this week clear. You'll not be sequestered; that is, you'll be together during the daytime, but in the evening you'll be allowed to go to your respective homes with proper instructions. That is correct is it, General?
>
> MR. WHITLEY: Yes, sir.
>
> THE COURT: That is correct, is it not, Mr. Robbins?
>
> MR. ROBBINS: Your Honor, I'm not really—
>
> THE COURT: No sequestering at nighttime I'm talking about.
>
> MR. ROBBINS: I didn't anticipate that would come up at this point.
>
> THE COURT: I think I had already covered it, and you said there would not be a lock-up jury.
>
> MR. ROBBINS: I don't know if I recall that. I am frankly surprised right now that came up right now, judge.
>
> THE COURT: It would have to come up now if it is coming up at all.
>
> MR. ROBBINS: In that event, *the defense would not consent to waive her rights on that question.*

THE COURT: All right. Thank you. I will instruct the jury, and I think you'll have confidence in the jury.

> MR. ROBBINS: Yes, sir.

After the jury was selected, the trial judge commented as follows:

> THE COURT: Would you turn around just a minute, please? We have a jury selected, and we'll begin the trial. We have not intended to make more out of the trial as far as the time that it would take than we felt appropriate. It could go this week. Now I want to be sure that none of you have any matters that you know of now, doctor's appointments or weddings to attend for the ladies or what-have-you that would require your presence, because you will have to be here until the trial is finished. Is there anybody, including the alternates, that cannot do ˚that, because I'm going to excuse these other two people?

Before any introduction of testimony, the following exchange took place:

> MR. ROBBINS: Your Honor please, there is one matter before the jury comes in. This was briefly alluded to, and that is the question about whether the jury will go home at night. It's not my recollection we had even spoken to that question before. But after careful consideration of the entirety of the case I can say on behalf of the defendant that *she desires not to waive the right to have the jury sequestered.* I just wanted to make that clear.
>
> THE COURT: Mr. Robbins, I asked you that question before we ever started selecting the jury, and at that time you acquiesced. And now it's just too late for me to sequester the jury. It would be impossible for me to.
>
> MR. ROBBINS: Your Honor, I'm just stating for the record I don't recall it. I'm not saying I didn't. It is not my recollection that I did.
>
> THE COURT: Let's say that you did this morning, and *we have that on record,* when you were asked directly the question.
>
> MR. ROBBINS: Yes, sir.

THE COURT: You did this morning, at least, before we ever started jury selection?

MR. ROBBINS: Yes, sir.

THE COURT: Okay.

MR. ROBBINS: Right, and that's all I was—

THE COURT: We'll let that go. Beforehand I understood that somewhere in talking I told the jury they'd not be sequestered unless it was asked for ahead of time. Be that as it may, it was asked for before we started selection. So, now you can't change your mind in midstream. I think after you hear the instructions that I give the jury that you'll be pretty well satisfied.

The transcript does not establish that the defendant ever waived her right to a sequestered jury. The technical record contains no pre-trial waiver. In our view, it was not too late to require sequestration when the trial court understood that the defendant did not give her consent.

In *Gonzales v. State*, 593 S.W.2d 288 (Tenn.1980), the Supreme Court held as follows:

> The principles laid down in these cases are, 1st, that the fact of separation having been established by the prisoner, the possibility that the juror has been tampered with, and has received other impressions than those derived from the testimony in court, exists, and *prima facie* the verdict is vicious; but, 2d, this separation may be explained by the prosecution, showing that the juror had no communication with other persons, or that such communication was upon subjects foreign to the trial, and that, in fact, *no impressions other than those* drawn from the testimony, were made upon his mind. But, 3d, in the absence of such explanation, the mere fact of separation is sufficient ground for a new trial.

*Id.* at 291 (quoting *Hines v. State*, 27 Tenn. 597 (1848)).

▬▬▬ When there is an impermissible communication, there is a presumption of jury tampering. An "affirmative burden" is placed on the state to show that no prejudice actually occurred in order to permit harmless error analysis. *Id.* at 293. When a sequestered juror has communicated with a person not serving on the jury, this task is not complex. *E.g., State v. Blackwell*, 664 S.W.2d 686 (Tenn.1984). The very nature of such an encounter permits the juror and any person he came in contact with to be cross-examined by the defendant in order to ascertain any possible taint.

▬▬▬ In this instance, however, the defendant's right to have the jury sequestered was denied from the outset. Despite the trial court's commendable efforts to assure that the jury was not subjected to extraneous influences during the several day trial, any attempt by the prosecution to resolve the nature and degree of "communications with other persons" would, at this point, be monumental in scope. In our view, it would be a practical impossibility for the trial court, on remand, to determine that "no impressions other than those drawn from the testimony, were made upon [the jury's] mind." *Gonzales*, 593 S.W.2d at 291.

The error here, even in the face of considerable evidence of guilt, was not harmless. The ruling prejudiced "the judicial process." Tenn.R.App.P. 36(b); *see State v. Perry*, 740 S.W.2d 723, 726 (Tenn.Crim. App.1987).

The judgment must be reversed on this issue.

## VI

The defendant argues that seven state exhibits were prejudicial, repetitive, and hearsay.

▬▬▬ The admissibility of the photographs of the body and scene is discretionary with the trial court. There can be no reversal absent a clear abuse of that authority. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978).

▬▬▬ Exhibit 1 consists of five pictures of the general area where the body was found. Exhibit 2 is made up of five photographs of the body as found by the authori-

ties; only a stocking clad foot appears through the sand and gravel. Exhibit 3 depicts at intervals the unearthing of the body. Exhibit 4 consists of two photographs of the deceased's upper torso and head. The body is sprinkled with gravel. Two gunshot wounds are apparent. Exhibit 5 shows the deceased's jacket lying in the grass. Exhibit 6 is a photograph of blood soaked rocks over which the fire had been moved after the shooting.

Most of the photographs were highly probative, indicating concealment of both the body and the evidence. *State v. Braggs*, 604 S.W.2d 883 (Tenn.Crim.App. 1980). They were properly admissible to rebut any claim of self-defense. *See State v. Chambless*, 682 S.W.2d at 231 and *Cagle v. State*, 507 S.W.2d 121, 129 (Tenn.Crim. App.1973). The exhibits are probative on the issue of the defendant's intent. *See State v. Aucoin*, 756 S.W.2d 705 (Tenn. Crim.App.1988). The photographs tend to establish elements of the offense of unlawful abandonment of a body; the body's proximity to a stream, for example, was probative.

The defendant maintains that Exhibit 6 was admitted without proper forensic foundation. She alleges that there was no expert testimony that the blood on the rocks was either human or came from the deceased. The defendant also objected to certain of the exhibits because they were cumulative and irrelevant. We find each of the objections without merit.

■ The defendant contends that Exhibit 7, a drawing of the murder scene by Detective Farmer, was hearsay. The state answers that it was not hearsay because Detective Farmer was available for cross-examination. We subscribe to the following view:

> It is well settled that the declarant's presence in the courtroom will not avoid a hearsay objection. Even if the declarant takes the stand as a witness after the hearsay evidence is introduced, the evidence originally offered is nonetheless hearsay. Only sworn testimony in court subject to immediate cross-examination escapes the hearsay stigma.

D.F. Paine, *Tennessee Law of Evidence* § 49 (1974) (footnotes omitted) (citing *Sartin v. Stinecipher*, 209 Tenn. 20, 348 S.W.2d 492 (1961)).

We nevertheless find that the drawing was properly admitted. The Tennessee rule on admitting maps, diagrams and drawings is summarized in 29 Am.Jur.2d *Evidence* § 802 (1967):

> [I]t is a well-established rule, applied in everyday practice in courts, that maps, drawings, and diagrams illustrating the scenes of a transaction and the relative location of objects, if shown to be reasonably accurate and correct are admissible in evidence, in order to enable the court or jury to understand and apply the established facts to the particular case. The use of such items as testimony of the objects represented rests fundamentally upon the theory that they represent a method of pictorial communication of a qualified witness which he may use instead of, or in addition to, some other method. . . .
>
> Such maps, drawings, and diagrams may be made by the witness while testifying, either by his own hand or by directions to counsel, or they may be made prior to the trial, either by the witness or another. . . .

Although not objected to on hearsay grounds, this court has previously approved of the admission of maps, diagrams, and drawings. *Bryant v. State*, 539 S.W.2d 816, 819 (Tenn.Crim.App.1976), and *Armstrong v. State*, 548 S.W.2d 334, 337 (Tenn.Crim.App.1976).

"Hearsay" is defined as "testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value on the credibility of the out-of-court asserter." *State v. Laird*, 565 S.W.2d 38, 41 (Tenn.Crim.App.1978) (quoting Cleary, *McCormick on Evidence* § 225 (2d ed. 1972); *Cf.* Tenn.R.Evid. 801.[5]

---

**5.** Rule 801 defines hearsay as "a statement, other than one made by the declarant while testify-

■ As long as the witness has personal knowledge of the subject matter and the diagram is accurate, drawings drafted out of court are admissible despite the hearsay rule. The in-court authentication of the drawing is the assertion permitting cross-examination of its accuracy. *See* Tribe, *Triangulating Hearsay*, 87 Harv.L.Rev. 957 (1974). That is sufficient to satisfy the hearsay objection. *See State v. Randolph*, 190 Conn. 576, 462 A.2d 1011, 1017 (1983); J. Wigmore, *Evidence*, § 790 (Chadbourn Rev.1970).

This issue is without merit.

### VII

The defendant claims that a portion of her co-defendant's statement was improperly admitted.

■ During Detective Farmer's testimony, the District Attorney General asked a question designed to elicit the substance of the statement made by Mary Sue Scott. The defendant lodged a hearsay objection which the trial court sustained. After two jury out hearings, the trial judge allowed the following testimony:

Q: Captain Farmer, to get us back on track, after you had advised Deborah Furlough, the defendant, of her rights, what did she tell you?

A: She stated to me that her and Tim Furlough had met up with Mary Sue Scott there in Adolphus, Kentucky, that there was some conversation between them as far as them obtaining a ride to Nashville. Mary Sue Scott ended up with her father's truck, and both Tim and Deborah and Mary Sue Scott headed for Nashville, that that trip ended in the area of I65 near the Portland Orlinda exit. After a disagreement of sorts between Deborah Furlough and Tim Furlough, Tim Furlough got out of the truck and began walking towards Nashville, and that Deborah Furlough and Mary Sue Scott returned to the Adolphus, Kentucky, area.

Q: What did you observe about the way Deborah Furlough was acting at the time she gave you this statement?

A: Of course, at this time she did not appear to be distraught or crying or hysterical or upset.

Q: After she gave you this statement, what, if anything, did you say?

A: I stated to Mrs. Furlough that I did not think her statement was believable. I then told her that *I had a statement from Mary Sue Scott.* At this point she began to cry and related to me some vague statements—when I say vague, they were not organized or in any order—concerning some abuse by Tim Furlough towards her and also the possibility of Tim Furlough having some desire to have some contact with her sister. And at this point she stated or made the statement that maybe she should talk to an attorney, and at this time we stopped any questioning of Deborah Furlough. (Emphasis added.)

■ The defendant's statement was admissible as a statement of a party opponent. *See* D.F. Paine, *Tennessee Law of Evidence* § 54 (1974). We find no violation of the hearsay rule in the quoted testimony. The referenced portion of Scott's statement was not offered as proof of the matter asserted. In *State v. Laird*, 565 S.W.2d 38, 41 (Tenn.Crim.App.1978), we stated that "the out-of-court declaration in this case was offered not to prove the truth of its content ... but ... to show its effect on the hearer ... without regard to its truth or falsity." That rationale applies in this case.

■ Defendant also complains that the jury learned that Scott made inconsistent statements, and that the defendant gave a second, different statement only after being told that Scott had made her second statement. This contention is not supported by the record.

While the District Attorney General did ask whether Scott's second statement was substantially the same as her first state-

ing at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion."

ment, the defendant's contemporaneous objection was lodged and sustained before the witness had an opportunity to answer. After a jury-out hearing, the court instructed the jury not to consider that question. This cured any error.

The issue is without merit.

### VIII

The defendant contends that the trial court improperly limited her proof of violent acts and threats by the deceased toward other persons. Her motion in limine requesting an advance ruling on which acts of the deceased would be permitted into evidence was not acted upon until the defendant testified.

The court allowed third party testimony showing the deceased's violent acts towards the defendant and their daughter, but did not allow (1) the defendant to testify to her knowledge of a threat made by the victim to sexually assault her 11 year old sister; (2) testimony by defendant's cousin that the victim said he intended to have unlawful sexual relations with another of the defendant's sisters; (3) testimony by another of defendant's cousins that the victim showed a child pornography brochure to him and said he was going to order such a film; (4) testimony by the defendant's sister concerning a sexual assault on her by the victim; and (5) the victim's prior criminal record consisting of a 1980 guilty plea to assault (reduced from a charge of sexual battery), a 1986 guilty plea in Kentucky to making a harassing or obscene phone call, and a 1982 guilty plea to sexual battery.

The rule in *Williams v. State*, 565 S.W.2d 503 (Tenn.1978), permits the defendant to testify to her knowledge of recent acts of violence by the victim against others. This relates to any apprehension on the part of the defendant immediately prior to and during any assault. The evidence cannot be adduced from witnesses other than the defendant, as proof in chief, but may be introduced in rebuttal if the "state presents evidence to disprove defendant had received such information." *Id.* at 505.

The proof is limited to what the defendant was actually told by the other witnesses.

Either the threat of sexual assault or the act itself upon the minor sister should have been permitted into evidence through the testimony of the defendant. That fact was marginally relevant to show the defendant's "state of mind, ... fears and apprehensions" at the moment she shot the victim. *Id.*

In *State v. Jones*, 729 S.W.2d 683 (Tenn.Crim.App.1986), the defendant sought to introduce evidence that the deceased, as a juvenile, had committed violent acts toward third persons; the purpose was to impeach a state witness' testimony that the deceased had a peaceful character. In dictum, we stated that "specific acts of the deceased toward third persons are not admissible to show that he had a reputation for violence"; however, the evidence is admissible if the defendant knew of those acts at the time of the conflict. *Id.* at 686.

In this instance, the trial judge did not permit the evidence because it could not be rebutted by the victim. We think the exclusion of this evidence was probably error. We are satisfied, however, that the omission did not affect the verdict. There was other ample evidence of the victim's proclivity for sexual perversity and abusiveness.

Secondly, the defendant contends that the trial court should have permitted the defendant's cousin to testify about his intentions to have sexual relations with another of her sisters. While conceding that the evidence is inadmissible under the *Williams* rationale, the defendant asserts that the proof is admissible to establish that the victim was the aggressor in the conflict which led to his death. The state argues that our decision in *State v. Aucoin*, 756 S.W.2d 705 (Tenn.Crim.App.1988) also controls; "evidence of recent violent acts committed by the deceased against others may not be introduced by a witness other than the defendant during the defendant's case in chief." *Id.* at 711.

In *Little v. State*, 65 Tenn. 490 (1873), our Supreme Court held as follows:

But in all cases where the acts of the deceased in reference to the fatal meeting are of a doubtful character, then evidence which may tend to show that he sought the meeting or began or provoked the combat is admissible. And in this view, previous threats made by the deceased, though not communicated ... may yet tend to show the animus of the deceased, and to illustrate his conduct and motives, and in some cases might be important, in the absence of more direct evidence, to sbow which party began or provoked the fight.

*Id.* at 493; *See* D.F. Paine, *Tennessee Law of Evidence* § 24 (1974).

In such an instance, whether the defendant knew of that reputation is irrelevant. *State v. Barnes,* 675 S.W.2d 195, 197 (Tenn.Crim.App.1984). A defendant is "entitled to show the state of mind of the deceased so the jury could determine who was the true aggressor." *State v. Butler,* 626 S.W.2d 6 (Tenn.1981). The rule is limited and becomes operative only where relevant to establish which of the combatants is the aggressor. This evidence must be carefully distinguished from evidence presented to show the *accused's* state of mind. *Cf. State v. Williams,* 565 S.W.2d at 505; J. Wigmore *Evidence* § 63 (Chadbourn Rev.1970). *See* D.F. Paine, *Tennessee Law of Evidence* § 24 (1974); *Accord* 40 Am.Jur.2d *Homicide* § 305 (1968).

▮ Whether a distinction should be made between specific acts of violence by the deceased against third persons and acts of violence against the accused was not addressed in *Williams.* Our research has shown that, despite a number of Tennessee cases purporting to address this question, none has directly confronted the issue in terms of whether these acts are admissible to show prior aggression by the deceased. The case cited by the state specifically declined to rule because the issue was improperly preserved for appeal. *Aucoin,* 756 S.W.2d at 711. *See also Jones,* 729 S.W.2d at 686. Other cases are entirely silent on the issue. *Chaffin v. State,* 209 Tenn. 590, 354 S.W.2d 772 (1962); *Henley v. State,* 520 S.W.2d 361 (Tenn.Crim.App.

1974); *Broz v. State,* 4 Tenn.Crim.App. 457, 472 S.W.2d 907 (1971).

Of those jurisdictions admitting specific acts of the accused to show first aggression, none restricts this evidence to acts committed against the accused. *In People v. Wright,* 39 Cal.3d 576, 217 Cal.Rptr. 212, 219, 703 P.2d 1106, 1113 (1985), the court held that the deceased's character for violence may be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence); *See People v. Thomas,* 269 Cal.App.2d 327, 74 Cal.Rptr. 617 (1969). In *State v. Miranda,* 176 Conn. 107, 405 A.2d 622, 625 (1978) the court allowed the accused to "show ... that the deceased was the aggressor by proving the deceased's alleged character for violence. The deceased's character may be proved by reputation testimony, by opinion testimony, or by evidence of the deceased's convictions of crimes of violence, irrespective of whether the accused knew of the deceased's violent character or of the particular evidence adduced at the time of the death-dealing encounter." *Accord, State v. Basque,* 66 Haw. 510, 666 P.2d 599, 602 (1983) (holding specific instances of victim's aggression are admissible to corroborate defendant's claim that victim was the aggressor); *People v. Lynch,* 104 Ill.2d 194, 83 Ill.Dec. 598, 470 N.E.2d 1018, 1020 (1984). *Hemingway v. State,* 76 Md.App. 127, 543 A.2d 879, 882 (1988); *Thompson v. State,* 659 S.W.2d 649, 653–55 (Tex.Crim.App.1983) *Stone v. State,* 751 S.W.2d 579 (Tex.Ct.App.1988); *United States v. Greschner,* 647 F.2d 740 (7th Cir.1981); *United States v. Burks,* 470 F.2d 432 (D.C.Cir.1972); *Commonwealth v. Beck,* 485 Pa. 475, 402 A.2d 1371 (1979); *Jordan v. Commonwealth,* 219 Va. 852, 252 S.E.2d 323 (1979).

In our view the better reasoned cases hold that specific violent acts of the victim are admissible to corroborate the defendant's assertion that the victim was the aggressor. *See Basque,* 666 P.2d at 602. These acts are *not* admissible to prove the victim acted in accordance with a character trait. Tenn.R.Evid. 404(a)(2) (effective January 1, 1990).

▮ Assuming the excluded evidence in this case supports the defendant's contention that the victim was the aggressor, it does not withstand the application of the balancing test. Fed.R.Evid. 403, *State v. Banks,* 564 S.W.2d 947 (Tenn.1978). Making use of that standard, we cannot conclude that the cousin's testimony was more probative than prejudicial. The same is true of the testimony about the victim's use of child pornography. The proof intended to establish an assault by the victim against the defendant's sister, not previously communicated to the defendant, was also properly excluded. None of the testimony bore upon the deceased's then existing state of mind. *See Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). *State v. Cravens,* 764 S.W.2d 754, 755 (Tenn.1989). We also note that the jury considered other evidence of the victim's sometimes violent sexual acts. In proper context, none of the excluded evidence would have, if admitted, changed the results of the trial.

▮ The victim's criminal record, although referred to in the motion in limine, was not introduced into evidence. Neither allegations of counsel nor pleadings are evidence. *Hillhaven Corporation v. State,* 565 S.W.2d 210, 212 (Tenn.1978); *Trotter v. State,* 508 S.W.2d 808, 809 (Tenn.Crim.App.1974). The issue is subject to the waiver rule. If the issue was properly raised, we would not have found prejudicial error. The victim apparently had convictions for assault in 1980 and sexual battery in 1982; while the offenses were violent and not remote, we think the admission of the evidence, in consideration of the entire record, would not have affected the verdict. *See State v. Morgan,* 541 S.W.2d 385 (Tenn.1976); Tenn.R.Evid. 609(b) (effective January 1, 1990). The deceased's conviction for making an harassing phone call is not probative of any violent nature and was properly excluded.

This issue has no merit.

## IX

▮ The defendant contends that her expert was improperly prevented from answering a hypothetical question regarding the reasonableness of her belief of impending attack from the deceased. The state responds that the question invaded the province of the jury.

In support of her theory of defense, the defendant presented the testimony of a social psychiatrist specializing in domestic violence. The expert, Dr. Peachey, described the "battered woman syndrome" as a subcategory of post traumatic stress disorder, a condition recognized by the *Diagnostic and Statistical Manual* of the American Psychiatric Association. The witness described the battered woman, subjected to various means of abuse, as brainwashed by isolation and intimidation; the condition fosters the belief that the abuser is so powerful that she can do nothing to prevent further abuse.

The psychiatrist explained that the abuse follows a three stage, cyclical pattern. The first stage begins with insinuations or name calling, accompanied by threats of physical violence; this is done to assure the woman's obedience. The second stage is the actual physical abuse by the male. The last stage is a reconciliation period during which the man persuades the woman to stay by expressing his sorrow for the violence. The common reaction of the battered woman is to believe these promises and rationalize the violence as her own fault. The last stage disappears once the man realizes that the woman will not leave him. The doctor explained that a battered woman does not quit the relationship because she continues to love her abuser and feels that she is responsible for keeping the marriage together and rearing the children. She testified that in rural areas, very little help is available from the state. Members of the battered woman's own family often feel she brings the abuse upon herself.

The expert explained that a battered woman, in order to avoid future abuse, develops an automatic response to her husband's actions which have signalled an imminent beating. The slightest act by her husband, often insignificant and unnoticed by others, can signal an impending beating.

A battered wife is hyperalert for these signals.

Dr. Peachey's examinations of the defendant found no abnormality other than symptoms consistent with the diagnosis of a battered woman. Based on these examinations it was Dr. Peachey's opinion that, on the day of the shooting, the defendant was suffering from the battered woman syndrome, a post traumatic stress disorder.

The specific testimony excluded by the trial court consisted of a hypothetical question outlining the circumstances of the shooting. Defense counsel asked Dr. Peachey whether she had an opinion, based on her medical knowledge and experience, as to the defendant's perception of fear and imminence of danger at the time defendant killed her husband.

The trial court sustained the objection on the basis that the jury, and not the expert, should determine whether the defendant believed she was in imminent danger of attack immediately prior to the shooting.

In *City of Columbia v. C.F.W. Construction Company*, 557 S.W.2d 734 (Tenn. 1977), our Supreme Court expressly rejected the idea that expert testimony is inadmissible because it goes to an ultimate issue in the case. "[T]he better rule is that an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of facts, so long as it is helpful to the court." *Id.* at 742.

One treatise suggests that the single question for the trial court is whether the expert testimony is necessary "to aid the jury. If not, the expert should not even be called to the stand; if so, he should be allowed to testify without judicial cavilling about usurping the province of the jury." D.F. Paine, *Tennessee Law of Evidence* § 177 (Supp.1988). *See State v. Atkins*, 681 S.W.2d 571, 577 (Tenn.Crim.App.1984).

Some of our case law suggests that the expert's opinion may not touch on an ultimate issue. *See State v. Ward*, 712 S.W.2d 485, 487 (Tenn.Crim.App.1986). The better view may be that a witness who cannot establish satisfactory credentials as an expert or one who attempts to qualify in an unrecognized area of expertise should not be permitted to testify at all. *See State of Tennessee v. Frederick Schimpf,* 782 S.W.2d 186, 193–194 (Tenn.Crim.App.1989) application for permission to appeal denied.

The trial court found that the witness was an expert in her field; her testimony would assist the trier of fact; the subject matter of her testimony conformed to a generally-accepted explanatory theory; and the probative value of her testimony outweighed its prejudicial effect. *See State v. Williams*, 657 S.W.2d 405, 412–13 (Tenn. 1983); *State of Tennessee v. Frederick Schimpf*, at 191. Because she qualified as an expert, it was error to prevent her from answering merely because it embraced the ultimate issue.

■■■ ·The state, however, insists that in this case the error was not prejudicial. We must agree.

The standard for determining harmless error is whether, considering the record as a whole, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn.R.App.P. 36(b).

The court's charge on self-defense instructed that the belief of imminent death or great bodily harm must be honestly believed and founded on reasonable grounds. Whether the defendant shot her husband with malice or in self-defense was the central issue in the case. Although Dr. Peachey was not permitted to answer the hypothetical question on the ultimate issue, it is apparent, in context, that the answer would have been favorable to the defendant. The expert's testimony was exhaustive, was in support of the theory of self-defense, and provided the jury with a factual basis upon which to consider a not guilty verdict. Other than the statement of the witness' obvious professional opinion, little more would have been gained by the proposed question and answer.

### X

Defendant complains that the trial judge improperly charged the jury on several subjects.

■ Defendant requested that the trial court instruct on defense of another. She contends that there was evidence in the record to support such an instruction based on her testimony that, at the time she shot her husband, she feared that her daughter's life was in danger.

The law on defense of another is set forth in *State v. Barnes,* 675 S.W.2d 195 (Tenn.Crim.App.1984):

> Where a person is about to be injured by an assailant, then another person may make resistance sufficient to prevent the offense ... Further, a person interfering in a dispute, affray, or fight on behalf of another simply steps into the latter's shoes. *He may lawfully do in another's defense only what that person could have done, and no more.* He stands on the same plane, is entitled to the same rights, and is subject to the same conditions, limitations, and responsibilities as the person defended. And his act must receive the same construction as the act of the person defended would receive if the killing had been committed by that person. Thus, a person is not entitled to the plea of defense of another unless a plea of self-defense would have been available to the person on whose behalf he intervened. (emphasis added).

*Id.* at 196.

The defendant's requested instruction would have permitted the jury to find that the killing of her husband was justified if she reasonably feared for her daughter's safety. That is an incorrect statement of the law.

The defendant's remaining contention is that the trial court's instruction on presumptions and inferences was improper. We have reviewed the charge and find no error. *State v. Bryant,* 654 S.W.2d 389 (Tenn.1983).

### XI

The defendant alleges that a juror failed to reveal an affiliation with the state's chief witness, Detective Farmer. The state answers that the defendant has failed to establish prejudice or impropriety.

After the trial, Detective Farmer and a juror, later identified as Ms. Lillian Butler, were seen hugging in the hall outside the courtroom. A brief conversation ensued.

Both were called as witnesses at the motion for new trial. The testimony at that hearing revealed that during the summer prior to the trial of this case, Detective Farmer, while campaigning for the office of trial judge, visited the juror's flower shop. They had seen each other since but had not spoken. During *voir dire,* Ms. Butler did not reveal her acquaintance with Detective Farmer.

Ms. Butler did not speak to Detective Farmer during the trial. She explained that she hugged many people, even strangers. She denied any romantic interest between her and Detective Farmer and testified that her acquaintance with him did not influence her decision in the least.

Detective Farmer remembered his visit to Ms. Butler's shop. While she spoke to him before the trial, he did not remember who she was until he saw her name on the venire. He avoided any communications with her until the trial ended.

■ Juror disqualifications are based upon either (1) *propter defectum* or (2) *propter affectum. Partin v. Henderson,* 686 S.W.2d 587 (Tenn.App. 1984). Objections based on general disqualifications, such as familial relationship, are within the *propter defectum* class and as such, must be challenged before a verdict. *Id.* at 589. In contrast, disqualifications *propter affectum* exist due to some bias or partiality toward one party in the litigation. *Id.; Toombs v. State,* 197 Tenn. 229, 234, 270 S.W.2d 649, 651 (1954). *Propter affectum* objections may be made after the return of the jury verdict. *Id.; Durham v. State,* 182 Tenn. 577, 582, 188 S.W.2d 555, 557 (1945). Because the defendant claims bias or partiality toward the state's witness, this is a case of *propter affectum.*

In *Toombs,* the juror was asked direct questions which necessitated a disclosure of his relationship to the prosecutrix. De-

spite a familial relationship, the juror remained silent.

 In this instance, the jurors were read the names of the prosecution's witnesses, the first of which was Detective Farmer. When asked whether she knew any of them, Ms. Butler did not respond.

While the acquaintance should have been disclosed, we are not satisfied that the juror intentionally withheld the information. More importantly, we do not think bias has been shown. The testimony at the motion for new trial shows that the two individuals involved had a casual relationship at best. We find no indication that Ms. Butler's participation in the verdict was influenced by her acquaintance with Detective Farmer. Her answers during *voir dire* were otherwise forthright and candid.[6] *Cf.*

*Clariday v. State*, 552 S.W.2d 759, 771–72 (Tenn.Crim.App.1976).

While this issue is overruled, we acknowledge that the problem will not likely re-occur upon retrial.

The conviction for unlawful disposition of a body is reversed and dismissed. The remaining convictions are reversed and remanded.

DUNCAN, P.J., and DAUGHTREY, J., concur.

---

**6.** At one point during her *voir dire,* Ms. Butler revealed she had seen a psychiatrist because her son suffers from Hodgkins's Disease.