# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2004 Session

## STATE OF TENNESSEE v. JOSEPH ANGEL SILVA, III

**Appeal from the Circuit Court for Bedford County**
**Nos. 15289 Charles Lee, Judge**

———————————

### No. M2003-03063-CCA-R3-CD - Filed May 25, 2005

———————————

On July 21, 2003, the Grand Jury for Bedford County returned an indictment against the defendant charging him with one count of aggravated rape. After a jury trial, the defendant was convicted as charged on October 1, 2003 and sentenced on October 27, 2003, to twenty-two (22) years in the Department of Correction. The defendant now appeals this conviction. He argues that (1) the trial court erred in denying the Defendant's motion for a new trial where there is evidence that a juror failed to disclose to the trial court after voir dire that she had had a conversation with the Defendant's brother and knows the brother personally; and (2) that the State violated <u>Jencks v. United States</u>, 353 U.S. 657 (1957), and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to disclose evidence of the victim's pretrial statement which contained exculpatory information. We conclude that these issues are without merit and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Fannie J. Harris, Nashville, Tennessee for the appellant, Joseph Angel Silva, III.

Paul G. Summers, Attorney General & Reporter; Elizabeth T. Ryan, Senior Counsel; Mike McCowen, District Attorney General; Michael D. Randles and Ann Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On May 14, 2003, the victim, Bonnie Jean Thomason, went to TC's Sport's Bar in Unionville. Her niece's boyfriend dropped her off at the bar alone between 7:30 and 8:00 p.m. The

victim was supposed to call her niece to give her a ride home. The victim was living with her sister at the time.

When she arrived at the bar, the victim immediately ordered a beer. She continued drinking and talking with a man at the bar throughout the evening. Around 11:00 p.m. to 12:00 a.m., the victim decided she wanted to go home. She did not have enough money for cab fare and did not want to call her niece because it would cost money. She asked the man she had been talking to at the bar if he was going near her niece's house, and he said no. Soon after this exchange, the Defendant offered the victim $12.00 for cab fare. The Defendant then offered to give her a ride home. The Defendant and the victim did not know each other prior to this conversation.

The Defendant and the victim got in his car and began driving. The victim and the Defendant were chatting, and the victim was not paying attention to where they were going. The Defendant pulled over to urinate. When he got back in the car, he grabbed the victim's head and put it on his still exposed penis and tried to force her to fellate him. The Defendant broke the victim's necklace and tore off her bra. He grabbed the victim from the passenger's seat and pulled her toward him. Her jeans were down, and she felt him vaginally penetrate her. The victim's head was hitting the back windshield as the Defendant had intercourse with her. She propped herself up on her hands to prevent this from happening and broke the ring on her finger. The Defendant also bit her shoulder.

The Defendant then flipped the victim over to penetrate her anally. He hit her in the head so hard that her upper plate of dentures was knocked from her mouth. Her flip flop shoes also came off her feet during the episode. At some point, she also lost her nose ring.

After raping the victim, the Defendant pushed the victim out of the passenger door and drove away. He left her standing in a parking lot, half-dressed, and missing her bra, flip-flops, upper denture and necklace. She stopped at a hotel and asked the clerk to call her sister. When her sister did not answer the phone, the victim began to walk toward Unionville. She was picked up by an driver of an eighteen-wheeler who drove her to Unionville. When she arrived in Unionville, an older gentleman gave her a ride to her sister's house. Her sister found her crying on the front porch. The victim told her sister she had been raped.

The victim was then taken to the hospital. A rape kit was performed. Dr. Allen Honig examined the victim and observed multiple marks on her back which were bruises and contusions that were consistent with being bitten. Both the vaginal and anal swabs and the smear slide taken as part of the victim's rape kit showed the presence of spermatozoa.

The police began an investigation of the case. A detective went to TC's and spoke with the bartender. The bartender was able to tell the detective the Defendant's name, where he worked, and the make and color of his vehicle. The detective located the Defendant's car at his place of employment and saw a bra with a torn strap on the rear floorboard behind the driver's seat. Another officer came out to help the detective. They informed the Defendant of the complaint, and the officers asked for permission to search the Defendant's car. The officer found the upper denture

plate, the flip-flops, the gold necklace and the nose ring inside the car. The Defendant then voluntarily went to the police department. He admitted to giving a woman a ride and having consensual vaginal, anal and oral sex with her. He also admitted to leaving the woman stranded on the side of the road.

On July 21, 2003, the Grand Jury for Bedford County returned an indictment against the Defendant charging him with one count of aggravated rape. After a jury trial, the Defendant was convicted as charged on October 1, 2003, and sentenced on October 27, 2003, to twenty-two (22) years in the Department of Correction.

A juror, Lynette Noteboom, Lynette Locke at the time of trial, was released for cause during the voir dire because she knew the Defendant and his brother. Sometime after the trial was concluded, Ms. Noteboom came to defense counsel with information about another juror, Wina Goodwin, who sat on the Defendant's jury. Ms. Noteboom felt that the information would have some bearing on the Defendant's case.

The Defendant filed two motions to set aside the jury verdict on October 27, 2003. He also filed a motion for a new trial on November 14, 2003. The trial court held a hearing on the motion for new trial on November 20, 2003. The testimony at the hearing concerned the juror issue, as well as testimony by the victim's cousin disputing much of the victim's testimony at trial. The Defendant's brother, Jacob Silva, was not present during the jury selection and did not know that Juror Goodwin was on the panel. On the first or second day of the trial, but definitely after the jury had been selected, Jacob ran into Juror Goodwin in the hall of the courthouse. She asked him what he was doing there. Jacob replied that his brother was on trial in the courtroom. Jacob knew Juror Goodwin because she is his ex-girlfriend's aunt, and Juror Goodwin works at a convenience store that Jacob frequents. April Newman is Juror Goodwin's niece and is the ex-girlfriend of Jacob. She and Jacob have a baby together, and at the time of the trial were in a dispute regarding the baby. There was no court involvement in the dispute between Ms. Newman and Jacob.

After the hearing, the trial court denied the Defendant's motion for a new trial on December 8, 2003. The Defendant filed a timely notice of appeal.

## ANALYSIS

The Defendant brings two issues for our review: (1) whether the trial court erred in denying the Defendant's motion for a new trial where there is evidence that the juror in question failed to disclose to the trial court after voir dire that she had had a conversation with the Defendant's brother and that she has a relationship with him; and (2) whether the State violated Jencks v. United States, 353 U.S. 657 (1957), and Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose evidence, during discovery, of the victim's pretrial statement which contained exculpatory information.

## Alleged Juror Misconduct

The Defendant's first issue is that the trial court erred in denying his motion for new trial because Juror Goodwin is the aunt of the former girlfriend of the Defendant's brother. This issue was included in the Defendant's motion for new trial and was an issue addressed at the hearing on the Defendant's motion. Following the hearing, the trial court filed its opinion. The trial court's findings were as follows:

The Defendant alleges misconduct on the part of Juror Wina Goodwin.[footnote omitted] Juror Wina Goodwin is the biological aunt of April Newman. April Newman and Jacob Silva, the brother of the Defendant, are the unmarried parents of a child. Jacob Silva was a potential witness in Defendant's trial. April Newman and Jacob Silva have had difficulty over visitation and child support issues.

Both Juror Wina Goodwin and April Newman acknowledged the biological relationship. Each further testified that there has been no social interaction between them other than chance meetings. On at least two occasions before Defendant's trial April Newman introduced Jacob Silva to Juror Wina Goodwin as her boyfriend. These introductions occurred on chance meetings between Juror Wina Goodwin and April Newman, once at a Goodwill Store Store [sic] and another time at a drive-through window at a convenience market where Juror Wina Goodwin was employed. Jacob Silva had also patronized the business where Wina Goodwin was employed. Jacob Silva claimed to have given Juror Wina Goodwin the phone number of April Newman upon her request at her place of employment. Juror Wina Goodwin denied ever requesting or receiving April Newman's phone number from Jacob Silva.

During voir dire, all potential jurors, including Wina Goodwin, were asked by the state's attorney if they knew anyone by the name of Jacob Silva. Juror Wina Goodwin indicated she did not. Jacob Silva was not present during voir dire and was never exhibited to the venire.

On a recess during the Defendant's trial, Juror Wina Goodwin observed Jacob Silva in the hallway of the courthouse and inquired as to why he was present. Jacob Silva informed Juror Wina Goodwin that his brother was the Defendant. Although Jacob Silva now claims that Juror Wina Goodwin holds animosity toward him and his family because of his relationship with April Newman, he inexplicitly failed to inform anyone that Juror Wina Goodwin should not sit on his brother's trial until after the verdict was rendered.

Juror Wina Goodwin acknowledged that she was familiar with Jacob Silva's face and associated the face with April Newman. However, she denied she recalled Jacob Silva's name and only associated Jacob Silva with the Defendant upon learning of Jacob Silva's relationship with the Defendant in the hallway of the courthouse. Juror Wina Goodwin testified that she did not answer the states [sic] attorney's question

-4-

because she did not recognize the name. She further testified that she did not report her new found knowledge because such knowledge would not have affected her verdict. Further, Juror Wina Goodwin testified that her relationship with April Newman in no way affected her judgment in reaching a verdict in Defendant's trial and that she never informed any other juror of any of these matters.

After observing the demeanor of the witnesses at Defendant's motion for new trial hearing, the Court accredits Juror Wina Goodwin's testimony in every respect.

The trial court did not reference the testimony of April Newman, the juror's niece and Jacob Silva's ex-girlfriend. However, we feel that it is important to our review to include a portion of her testimony at the hearing. Her testimony is as follows:

Q. All right. Do you know Wina Goodwin?
A. Do I know Wina Goodwin?
Q. Yes. Garrett. Do you know Ms. Goodwin, Wina Goodwin?
A. Yes.
. . . .
Q. How is she related to you?
A. She is my biological father's sister.
Q. That would make her your aunt?
A. Yes.
Q. Do you and Ms. Goodwin have a relationship?
A. No.
Q. You don't have any relationship at all?
A. No.
Q. You don't see her?
A. I have seen her at the store that she works at and at a yard sale that I went to. Other than that, I don't see her as well as I don't see my biological father.
Q. Is Ms. Goodwin aware that you have a child with Jacob?
A. Yes.
Q. How does she know that?
A. I went to her yard sale not knowing it was her's. That is how she met her.
. . . .
Q. Where was the yard sale?
A. At her house on Garrett Road.
Q. Do you know what her address is?
A. No, I do not.
. . . .
Q. At that time you discussed your relationship of the child with Ms. Goodwin?
A. Uh-huh.
Q. Who was present for that conversation?
A. Just me and her.

. . . .

Q.      What did you tell Ms. Goodwin?

A.      I didn't even know at first that she was my aunt until she – I pulled up, and she was talking to me about it. That is when my biological mother – biological father's mother came out there and was asking me questions about Dean, and how I knew about the yard sale, all of that. It was all just coincidental.

. . . .

Q.      Now, you said this happened in – somewhere in June of this year?

A.      I am guesstimating.

Q.      Did you ever tell Jacob about you meeting with your aunt?

A.      Yes.

Q.      When did you do that?

A.      Well, I don't know if it was the time – off and on, and on and off. It might have been a month later. I don't know. I can't remember. I told him.

Q.      Did – what did you tell Jacob about your aunt?

A.      Just that I accidently found out – found out where my dad lived. I haven't seen him all of my life, maybe since I was 3 years old. I told him about meeting his mom, they wanted me to come by and see them. I had a beautiful daughter, just conversation.

In State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993), this court analyzed this very issue in depth. In Akins, we stated:

Article I, Section 9 of the Tennessee Constitution, like the Sixth Amendment to the United States Constitution, provides the accused with the right to trial "by an impartial jury." The jury selection process must be carefully guarded to ensure that each defendant has a fair trial and that the verdict is determined by an impartial trier of fact. The Tennessee Constitution guarantees every accused "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954).

Bias in a juror is a "leaning of the mind; propensity or prepossesion towards an object or view, not leaving the mind indifferent; [a] bent; [for] inclination." Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 559 (1945). Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them "in response to those natural and human instincts common to mankind," id. 188 S.W.2d at 559, interfere with the underpinnings of our justice system.

The essential function of voir dire is to allow the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel. 47 Am. Jur. 2d, Jury § 195 (1969). Traditionally, our State has shown great respect and deference to the voir dire process. Our legislature had given parties in criminal

and civil cases "an absolute right to examine prospective jurors." Tenn. Code Ann. § 22-3-101 (1980 Repl.). . . . Since full knowledge of the facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." 47 Am. Jur. 2d, Jury § 208 (1969).

Tennessee follows the common-law rule by which challenges of juror qualifications fall within generally two distinct classes. Those challenges based on defects in statutory eligibility requirements are called propter defectum, which literally translated means "on account of defect." See Black's Law Dictionary 1098 (5th Ed. 1979). The other class of challenges, propter affectum ("on account of prejudice"), id., is based upon bias or prejudice "actually shown to exist or presumed to exist from circumstances." Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945) (quoting 1 Bouvier's Law Dictionary 451 (Rawle's 3d rev. 8th ed. (1914)). Propter defectum challenges must be made prior to verdict, but propter affectum challenges may be made after verdict. State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1990). Thus, when a juror conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may be made as here in a motion for new trial.

. . . .

[A] defendant bears the burden of providing a prima facie case of bias or partiality. See State v. Taylor, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983), perm. to appeal denied, (Tenn. 1984). When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945). Silence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. 47 Am. Jur. 2d § 208 (1969) (counsel has a right to rely on silence as a negative answer); see Hyatt v. State, 430 S.W.2d 129, 130 (Tenn. 1967) . . . . Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality, Hyatt v. State, 430 S.W.2d 129 (Tenn. 1967); Toombs v. State, 270 S.W.2d 649 (Tenn. 1954); Durham v. State, 188 S.W.2d 555 (Tenn. 1945), "the theory being that a prejudicial bias has been implanted in the mind which will probably influence the judgment." 188 S.W.2d at 558.

Akins, 867 S.W.2d at 356-57.

But, the question must be material and one to which counsel would reasonably be expected to give substantial weight. Insignificant nondisclosures will not give rise to a presumption of prejudice. See Furlough, 797 S.W.2d at 653. The test is whether a reasonable, impartial person would have believed the question, as asked, called for a juror response under the circumstances.

However, Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer. See Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1993) (determining that where there was no false answer or concealment, there was no inherently prejudicial relationship); Furlough, 797 S.W.2d 631 (Tenn. Crim. App. 1990) (finding of casual relationship, case reversed on other grounds).

A panel of this Court dealt with a similar issue in State v. Sammy D. Childers, No. W2002-00006-CCA-R3-CD, 2003 WL 214444 (Tenn. Crim. App., at Jackson, Jan. 30, 2003), perm. app. denied, (Tenn., May 27, 2003). In Sammy D. Childers, the defendant argued that there had been juror misconduct because one of the jurors had failed to disclose a prior acquaintance with the victim. Sammy D. Childers, 2004 WL 214444, at *1. At the hearing on the motion for new trial, the juror in question testified that she knew the victim because he had been the best man in a friend's wedding and she had been on a boat with the victim one time. Id. at *2. She also stated that she was not good friends with him and never discussed the case with the victim. Id. On appeal we concluded that the proof was that the juror in question did not have a close acquaintance with the victim. We also stated that there was no evidence of bias or partiality. Therefore, we affirmed the trial court's denial of the motion for new trial.

The facts in the case sub judice are very similar. At first blush, it might seem that Jacob Silva's ex-girlfriend's aunt would have a bias against the Defendant's family. However, it is clearly evident from the testimony at the motion for new trial that April Newman and Juror Goodwin did not have anything approaching a close familial relationship. Miss Newman testified that she had had no contact with her biological father or his family since she was three (3) years old. Miss Newman did not even know that Juror Goodwin was her aunt until she went to a yard sale held by Ms. Goodwin.

Juror Goodwin testified that she had met the Defendant's brother in passing at a convenience store, but did not remember his name. It is clear from Juror Goodwin's testimony that she did not realize that Miss Newman's boyfriend was the Defendant's brother. Both Juror Goodwin and Jacob Silva testified that when she ran into him in the hall, she asked him what he was doing there. He told her at that time that he was the Defendant's brother. Clearly, Juror Goodwin had only a casual acquaintance with the defendant's brother.

The trial court accredited the testimony of Juror Goodwin. Juror Goodwin testified that the fact that the Defendant's brother was her biological niece's ex-boyfriend did not affect her judgment in any way. Findings of fact made by the trial court are given the weight of a jury verdict. State v. Burgin, 668 S.W.2d 668, 669 (Tenn. Crim. App. 1984). We find that the evidence presented at the

hearing supports the findings of the trial court. The relationship between Jacob Silva and Juror Goodwin was a casual relationship at best. There is no evidence of an inherently prejudicial relationship. We conclude that the State has overcome the presumption of prejudice.

Therefore, this issue is without merit.

### Jencks and Brady Issue

The Defendant argues that the State violated the rules announced in Jencks v. United States, 353 U.S. 657 (1957), and Brady v. Maryland, 373 U.S. 83 (1963), which provide that the State must turn over recorded witness statements made to the police and that the State must provide the defendant with any favorable evidence which is material to either guilt or punishment. The Defendant specifically points to a written report taken by Detective Brian Crews indicating that the victim did not know her attacker's name and that she had told Patrolman Bill Logue and Sergeant Jason Williams a description of the attacker as "short, stocky, with dark skin, and dark hair, possibly being of Hispanic origin, without a Spanish accent." The Defendant also complains that the State did not turn over that Detective Crews learned that the Defendant admitted he had consensual sex with the victim and that the victim stated in her initial statements that she was also in the company of at least one other man who was a truck driver the same morning that the incident occurred. The Defendant argues that the lack of this information hampered his ability to cross-examine the victim at trial.

#### Alleged Brady Violation

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; see also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process violation under Brady, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information, whether requested or not);
2. The state must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Id.

When determining the materiality of undisclosed information, a reviewing court must establish whether "in [the] absence [of the information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419,

-9-

434 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Edgin, 902 S.W.2d at 390-91.

The Defendant in this case filed a motion for discovery on July 24, 2003. In that motion he requested any exculpatory materials that the State had in its possession. On August 5, 2003, the State responded that any exculpatory evidence, if any existed, would be provided to the defendant when it became known to the State. The State did not give any exculpatory evidence to the defendant prior to the trial.

The Defendant argues that the State violated his rights by not turning over the written police report, not divulging the fact that the Defendant admitted he had consensual sex with the victim, and that the victim was in the company of another man, a truck driver, the night of the incident. Although the Defendant requested any exculpatory information, there is no dispute that the information in question was not turned over to the defense. However, the Defendant must also prove that the information was both favorable to him and material.

We first analyze whether the victim's description of her attacker was favorable to the Defendant and material for trial purposes. The victim told the officers that she did not know her attacker's name and described him as "short, stocky, with dark skin, and dark hair, possibly being of Hispanic origin, without a Spanish accent." The Defendant argues that he was bald the night of the attack and that he does not have dark skin, as shown by the police line-up photograph. Obviously, the victim's description of her attacker would be considered favorable evidence if it differed significantly from the Defendant's actual appearance. However, to be material, there must be a reasonable probability that the outcome of the trial would have been different if the information in question had been provided to the Defendant. We conclude that the information complained of would not have altered the outcome of the trial for two (2) reasons. First, the Defendant cross-examined the victim as well as a law enforcement officer concerning a similar description the victim gave to a nurse at the hospital. Therefore, the Defendant obviously had identical information about the victim's description of her attacker and was able to cross-examine her with respect to it, and she admitted she had give such a description. In addition, there was overwhelming evidence to support the Defendant's conviction. The officers found the victim's missing belongings and her dentures in the Defendant's car and the Defendant admitted that he did indeed have sexual relations with the victim. There is overwhelming evidence to support the Defendant's conviction without the inclusion of the victim's description of her attacker given to police. For this reason, we conclude that this information is not material as defined Edgin.

The Defendant also argues that failure to disclose two other pieces of information violated his constitutional rights as set out in Brady. These two pieces of information are a statement made to the police by the Defendant that he had consensual sexual relations with the victim and information that the victim was also in the company of a truck driver the night of the incident. As with the victim's description, the first two factors set out in Edgin have been met. We now turn to whether this information was favorable to the Defendant and material at trial. The facts that the

Defendant admitted to the police that he had consensual sexual relations with the victim and that the victim was in the company of another man cannot be considered favorable to the Defendant in this situation because the Defendant's theory at trial was that he and the victim engaged in consensual sexual relations.

Moreover, the fact that the victim was around another man the same night of the incident is not relevant to whether the Defendant raped the victim, when he admitted to having sexual relations with the victim, and made no claim that someone else had raped her. Finally, as noted above, the overwhelming proof against the Defendant belies any notion that disclosure of these facts would have altered the results of the trial.

Alleged Jencks Violation

The Defendant further argues that the State violated the provisions of Rule 26.2(e) of the Tennessee Rules of Criminal Procedure, also known as the Jencks Act, by failing to provide the defendant with the victim's description of her attacker. In pertinent part, the rule reads as follows:

Production of Statements of Witnesses.--

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.
. . . .
(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

Tenn. R. Crim. P. 26 (a) & (e).

We have reviewed the record at trial, including the Defendant's discovery motion. We have been unable to find a request for Rule 26.2 material in the Defendant's discovery motion. Following the victim's testimony, the defendant failed to make a request for any Jencks material. The Defendant also failed to request any Jencks material after he cross-examined the victim and again after the testimony of Detective Crews' during whose testimony the Defendant claims to have learned of the description of the attacker for the first time. The Defendant also failed to make any objection at trial to not being provided the information. Rule 26.2(e) sanctions do not apply when

the "party who did not call the witness" fails to request <u>Jencks</u> material.  <u>See</u> Rule 26.2(a).  Nor do they result when "the other party" is not ordered to produce the statements.  <u>See</u> Rule 26.2(e).

Any error which resulted from the State's oversight in not providing the Defendant with the physical description of the attacker could have been cured by the Defendant.  The Defendant obviously realized that the description had not been disclosed prior to the close of the State's proof.  A final judgment shall not be set aside for failure to comply with a Rule 26.2 order unless, considering the entirety of the record, "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."  Tenn. R. App. P. 36(b).  As we have stated above, we conclude that the absence from trial of the victim's description of her attacker would not "more probably than not affect the judgment" or cause "substantial prejudice."  The Defendant was obviously familiar with a similar description, the Defendant admitted to having consensual sexual relations with the victim and the evidence of the Defendant's guilt was overwhelming.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE