IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 19, 2015

**DEERIC MCAFEE v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Knox County**
**No. 101445     Mary Beth Leibowitz, Judge**

_____

**No. E2014-01829-CCA-R3-PC – Filed July 16, 2015**

_____

The petitioner, Deeric McAfee, filed in the Knox County Criminal Court a petition for post-conviction relief from his convictions of second degree murder and reckless endangerment. The petitioner alleged that his trial counsel was ineffective. The post-conviction court denied the petition, and the petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Deeric McAfee.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

> On February 19, 2008, the Knox County Grand Jury indicted the [petitioner] for the premeditated first degree murder of Tray Sherman and for the reckless endangerment of Timothy Flack, Jr. At trial, Roberta Flack testified that in 2007, she worked as a secretary and was addicted to cocaine.

In October 2007, Flack lived in a residence at 1511 Connecticut Avenue with her three minor children, the youngest of whom, Timothy Flack, Jr., was four years old. Her cousin, Anna Street, also lived with her. Flack stated that twenty-three-year-old Sherman was her boyfriend and that he occasionally stayed with her. However, she noted that their relationship was not exclusive. Flack acknowledged that she kept drugs in the house, that she used drugs with Sherman, and that Sherman sold drugs. Flack said that the [petitioner] had previously been to her house with her cousin, Precious Pruitt, and that he lived with his grandmother and other family members on the next street.

Flack said that on October 8, 2007, Sherman and his friend, Robert Davis, came to her house around 6:30 p.m. or 7:00 p.m. Sherman was driving his green Suburban, and he parked in the driveway. When he arrived, Moneek Logan was on the porch with Timothy and Logan's niece. Street, Diez Debro, and Flack were in the kitchen. Sherman came into the kitchen, upset and scared, and told Flack that he had a confrontation at a store down the street with Treece Hamilton, who was the [petitioner's] cousin. He said that Hamilton was injured during the confrontation. Flack said that Hamilton had been her friend and that Hamilton and Sherman had previously argued because of jealousy.

Later, Flack and Sherman left the house, intending to go to the store for cigarettes and to take Davis home. As they stepped outside, Flack saw the [petitioner] sitting on the porch with his head down. She asked what was wrong, the [petitioner] replied that nothing was wrong, and he got up as if to leave. Flack and Davis walked toward Sherman's truck. The [petitioner] and Sherman stood at the edge of the driveway near the sidewalk and started talking. They did not argue and smoked marijuana together. Flack and Davis repeatedly told Sherman that they needed to leave. Eventually, when Sherman ended the conversation and turned to walk toward his truck, Flack saw a flash from a gun. Sherman began to run, and Flack heard a couple more gunshots. Flack said that Davis ran away, but she did not know in which direction. The [petitioner] ran toward the park

across the street from Flack's house, in the direction of the [petitioner's] grandmother's house.

Flack told Logan, who was still on the porch with the children, to take the children inside the house. Logan complied. Flack looked for Sherman and found him lying in an alley around the corner from the house. Flack tried to talk to Sherman. Street came to the alley and started performing CPR on Sherman. Flack heard blood rattling in Sherman's lungs and told Street to stop. Flack called 911. Before police arrived, Flack removed $20 in cash and cocaine from Sherman's pocket. She gave the items to Street and told her to get rid of them. Flack said that either the police or paramedics removed Sherman's white t-shirt while trying to resuscitate him. Flack stated that Sherman did not have a gun that night.

Flack said that, after midnight, she spoke to Investigator Still. She identified the [petitioner] as the shooter, but did not disclose that she had taken drugs from Sherman's pocket. She stated that she later saw bullet holes in her house and that the holes were not there prior to the incident.

Flack said that after the shooting, she received calls and "dirty looks" from the [petitioner's] friends and family and that she feared for her family. Accordingly, she moved away from Knoxville.

On cross-examination, Flack acknowledged that she was on probation for a "bad check" charge in Ohio. She said that she gave the cocaine she took from Sherman to Street and that Street hid it between her breasts. Flack acknowledged that Sherman occasionally carried a gun but maintained that he was not carrying a gun on the night of the shooting.

Flack stated that Sherman was about 6 feet tall and weighed approximately 240 pounds. She said that Hamilton was approximately 5 feet tall and weighed more than 150 pounds. Flack stated that Hamilton was known to carry a knife and guns. When Sherman arrived at Flack's house, he

told her that he hit Hamilton after she threatened him and reached into her purse. Flack said that when she and Sherman came outside the house, the [petitioner] called Sherman over to him to talk. Flack stated that she thought the men were "talkin[g] about the confrontation, but it was no upset." She said that the [petitioner] was wearing a long t-shirt, and Flack thought that the [petitioner] took the gun from his pants pocket or from his belt. She saw the gun in the [petitioner's] hand after the shooting. Flack said that although the [petitioner] had been at her house many times, he had never caused trouble until that night.

Moneek Logan testified that she and Flack were friends and that on the night of October 8, 2007, she was at Flack's house. Logan said that sometime after 6:30 p.m., she was sitting on the porch, and Sherman and Flack were inside the house. Later, they came outside, and Flack walked toward Sherman's truck. Logan went into the house, got a beer, and went back outside. She saw Sherman and the [petitioner] . . . calmly talking. When Logan turned around, she heard shots fired. She saw the [petitioner] run toward the porch and Sherman run toward the back of the house. She said that she never saw a gun.

On cross-examination, Logan stated that after the shooting, she left the house and went to the alley where Sherman was lying. She saw Flack try to revive him, but he was already dead. She said that she did not see Flack go through Sherman's pockets.

Knoxville Police Investigator Steve Still testified that he arrived at the scene at approximately 9:03 p.m. on October 8, 2007. He spoke with people on the scene and learned that the [petitioner] was the shooter. After about an hour, Investigator Still went to the hospital and saw Sherman's body. Investigator Still saw a gunshot wound to the back of Sherman's left torso.

Investigator Still said that based upon his investigation, he concluded that the shooter was standing near the sidewalk and fired toward the direction of the house.

Flack specifically told Investigator Still that Sherman did not have a gun, and no other witness reported Sherman having a gun.

Investigator Still said that when he looked at Sherman's shirt, he saw a bullet hole surrounded by gunpowder burns, which indicated the shot was fired at close range.

On cross-examination, Investigator Still said that he had seen a police report documenting the incident between Sherman and Hamilton. He said that Hamilton had an injury to her face or nose. He stated that he did not know if the [petitioner], who was related to Hamilton, knew of the altercation before going to Flack's house.

Knoxville Police Crime Scene Officer Gerald Smith testified that at 9:20 p.m. on October 8, 2007, he reported to the scene of a shooting at 1511 Connecticut Avenue. Upon arrival, he learned that paramedics had already taken Sherman to the hospital. Officer Smith was informed that Sherman was discovered lying in an alley behind the residence. Officer Smith went to the alley and found a size XXXL white t-shirt that had a bullet hole in it and was stained with blood. Gunpowder was surrounding the bullet hole in the t-shirt, which indicated that the gun had been fired at close range. Officer Smith said that police never recovered a weapon in connection with the case.

Officer Smith testified that bullets had struck the front of the house. Specifically, a bullet hole was located between a window and the right side of the house and another was found in a down spout at the corner of the house. The location of the bullet holes indicated that the shots were fired toward the front of the house. Officer Smith stated that he did not find any cartridge casings at the scene, which suggested that the weapon involved was likely a revolver.

Officer Smith said that after examining the crime scene, he went to the University of Tennessee Medical Center emergency room trauma bay where he learned that Sherman

had been pronounced dead. In the emergency room, Officer Smith took photographs of the bullet entrance wound, which was located on Sherman's left side near the back. Officer Smith accompanied Sherman's body to the Forensic Center where the Knox County Medical Examiner performed autopsies. After the autopsy, Officer Smith recovered the bullet that struck Sherman.

On cross-examination, Officer Smith stated that during his investigation, he found nothing to indicate that Sherman had a gun. Therefore, no gunshot residue test was performed on Sherman. He stated that the bullet recovered during the autopsy was a medium caliber, such as .32, .380, or 9 millimeter.

Knoxville Police Officer Edward Todd testified that at approximately 6:00 p.m. on October 10, he and Investigator Still met at the scene to perform a follow-up investigation. He stated that they were unable to find the bullets that were shot into the front of the house.

On October 9, 2007, Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties, performed an autopsy on Sherman. She determined that the manner of Sherman's death was homicide and that the cause of Sherman's death was a single gunshot wound to the chest area. Dr. Mileusnic-Polchan testified that the bullet entered the left side of the chest between the ninth and tenth ribs, perforated the left lung, damaged the diaphragm, tore the aorta and the esophagus, and damaged the liver and the right lung. The bullet caused extensive internal bleeding. Dr. Mileusnic-Polchan found a small caliber bullet in the accumulated blood in the chest cavity. She found gunshot residue indicating that the bullet was fired from "extremely close range." She stated that the only thing she could definitively say about the position of the shooter was that the muzzle of the gun was pointing toward Sherman's left side or back and slightly upward. Dr. Mileusnic-Polchan said that the victim would have been able to move for a short time after the wound was inflicted. Sherman's blood tested positive for cocaine.

On cross-examination, Dr. Mileusnic-Polchan said that Sherman was 5 feet, 9 inches tall and weighed 225 pounds. The bullet traveled "slightly back to front, left to right, and slightly upward."

The State rested its case-in-chief.

Anna Street testified on behalf of the [petitioner]. Street confirmed that in 2007, she was living with Flack on Connecticut Avenue. She stated that Flack was a liar, a thief, and a junkie.

Street stated that on October 8, 2007, Flack, Sherman, and Davis were in Flack's kitchen, snorting cocaine and talking about an incident that happened earlier. Afterward, they went outside. The children were in the kitchen, and Street went to the front bedroom, which faced the front porch. Street said she looked out the window and saw the [petitioner] walking down Connecticut Avenue toward Flack's house. Street could not see what transpired outside, but she heard three gunshots that sounded like they were being fired from two different guns. Street looked out the back window and saw Sherman running down the driveway beside the house. Sherman was holding himself, had a gun in his hand, and fell in the alley behind the house. She saw Flack approach Sherman, grab the gun, and take drugs from his pocket. Flack "got rid of" the gun then began yelling for help. Street went outside, and Flack asked her to help. Street began performing CPR. Street said that Flack asked her to hide the drugs and that she told Flack she did not want them. Street admitted that she did not tell the police about seeing Flack remove the gun from Sherman's hand.

On cross-examination, Street said that she ran errands during the day of October 8, 2007, and that she got to Flack's house around 6:00 or 6:30 p.m. She stated that Logan could have taken Timothy outside at some point, acknowledging that she was not watching Timothy's every move. Street said that she did not know where Flack hid Sherman's gun. Street stated that she told Investigator Still that Sherman had hit

Hamilton hard and that Hamilton had to go to the hospital. Street said that during her statement, she lied to police about Timothy being outside at the time of the shooting and about seeing no one with a gun, maintaining that she lied because she did not want to be involved and because Flack had threatened her.

Nicole ("Treece") Hamilton testified that the [petitioner] was her younger cousin and that he was eighteen years old at the time of the incident. She said that on October 8, 2007, she was standing outside Burnside Market with a friend when Sherman drove up, jumped out of the car, and hit her left eye. She said the eye came out of the socket. There was no bleeding, but the tear pocket burst and "ran water." Thereafter, she was taken to Fort Sanders Hospital, then she was transferred to the University of Tennessee Medical Center. She stated that she did not remember anything after she left Fort Sanders until she woke in the hospital a day or two later. She said that she remained in the hospital for almost two weeks. She stated that she was legally blind in her left eye and was going blind in her right eye. Hamilton denied ever threatening Sherman, noting that he was a large man.

Robert Dwight Wade testified that in October 2007, he lived about a block away from the [petitioner]. At around 7:00 or 8:00 p.m. on October 8, 2007, the [petitioner] called Wade and asked him to go to the basketball court. Wade told the [petitioner] that he could not go because he was "on punishment." He told the [petitioner] that they could play basketball at Wade's house, but the [petitioner] never came to Wade's house that night.

Robert Davis testified that he was with Sherman on October 8, 2007. He stated that he saw Sherman hit Hamilton in front of the Burnside Market. Davis said that Sherman always carried a gun and that he had a black .38 revolver with him that day, wearing it against his hip and concealing it with his shirt. Following the altercation, Davis and Sherman went to Flack's house. Upon arriving, they went inside and snorted cocaine. After a while, Sherman agreed to take Davis home,

and they went outside. Davis did not notice the [petitioner] approach the house, but he later saw him speaking with Sherman at the curb. Their conversation was not loud. Next, Davis heard gunshots and saw the [petitioner] running away. Davis could not recall the direction in which the [petitioner] ran. After the shots, Sherman ran behind the house into the alley, still carrying his gun.

Davis testified that Flack told him to not let the [petitioner] "'get away with this,'" saying that he needed to tell the police that Sherman did not have a gun. Davis said that he complied and lied when he gave his statement. He changed his story one or two weeks before trial when he told the State that he had lied in his statement. Davis admitted that he was on probation and had numerous prior convictions.

The twenty-one-year-old [petitioner] testified that he . . . had never been arrested before this incident and that he had been to Flack's house many times. He stated that he knew of Sherman; specifically, he knew Sherman was a drug dealer and, therefore, believed Sherman carried a gun.

On October 8, 2007, the [petitioner] had been at a junkyard with a cousin. He returned to his grandmother's house around 7:00 or 8:00 p.m. The [petitioner] said that he did not learn of anything happening to Hamilton that day. At home, the [petitioner] changed clothes and called Wade about playing basketball. After the call, the [petitioner] began walking toward Wade's house. The [petitioner] said that he had to walk past Flack's house to get to Wade's house. The [petitioner] said that he was wearing a t-shirt, a pair of basketball shorts, and another pair of shorts. He acknowledged that he was carrying a .38 caliber revolver for protection.

As the [petitioner] passed Flack's house, Sherman and Davis came out of Flack's house. Flack said "hey" to the [petitioner], and Davis asked him for a cigarette. The [petitioner] approached and gave Davis the cigarette. Sherman walked over to the [petitioner] and started talking to him. The [petitioner] said that Sherman was acting "hyper."

Sherman told the [petitioner] "about him hittin[g] some bitch in the eye." Later in the conversation, Sherman revealed that the person he hit was Hamilton. The [petitioner] told Sherman to not disrespect his cousin. Sherman continued speaking of Hamilton in derogatory terms. The [petitioner] said that he was feeling shaky and scared because Sherman had hit his cousin, Sherman was much bigger than the [petitioner], and Sherman had a reputation for carrying a gun. The [petitioner] said that Sherman took out some cocaine and snorted it. The [petitioner] again asked Sherman to refrain from disrespecting his cousin. Sherman responded, "I don't really give a f[***] about s[***] 'cause I keep my heater." Sherman lifted his shirt and showed the [petitioner] his gun which was tucked into his waistband. Sherman then told the [petitioner] to "go get [his] whole family," and he reached for his gun. The [petitioner] then grabbed his own gun and shot Sherman. The [petitioner] said that after he was shot, Sherman turned and fired at the [petitioner], and the [petitioner] heard another gunshot. He shot backwards toward Sherman and ran in the direction of his grandmother's house.

As he ran, the [petitioner] threw his gun into a dumpster by the "Rec Center." He said that he did not want to keep the gun because he knew he had shot Sherman. The [petitioner] did not know until later that Sherman was dead. He stated that he drew his gun in self[-]defense because Sherman drew his gun and the [petitioner] feared Sherman would kill him.

On cross-examination, the [petitioner] conceded that he did not dispute that Sherman's gunshot wound was inflicted at close range. The [petitioner] also conceded that he shot toward the house at least one other time. He acknowledged that he did not turn himself into the police until two days after the shooting and after speaking with his grandmother and an attorney. The [petitioner] said that he obtained the revolver in July 2007. He agreed that Sherman's "disrespecting" Hamilton angered him. The [petitioner] maintained that he had fired a gun only one time prior to

- 10 -

October 8, 2007.  The [petitioner] asserted that there were no children on the front porch of Flack's house.

State v. Deeric McAfee, No. E2010-01730-CCA-R3-CD, 2013 WL 794330, at *1-7 (Tenn. Crim. App. at Knoxville, Mar. 4, 2013) (footnote omitted).  The jury convicted the petitioner of second degree murder and reckless endangerment, for which he received a total effective sentence of twenty years.  Id.

Thereafter, the petitioner filed a petition for post-conviction relief.  He alleged that his trial counsel was ineffective by failing to request a hearing under Tennessee Rule of Evidence 404(a)(2) to allow the introduction of evidence of Sherman's prior arrests for drug and gun offenses, which evidence the petitioner contends would have corroborated his claim that Sherman was the first aggressor.

At the post-conviction hearing, both parties relied solely upon the arguments of counsel and did not put on proof.  The petitioner's post-conviction counsel noted that at trial, trial counsel asked the court to allow the defense to introduce "the fact that there were pending felony drug charges against Mr. Sherman who was the victim of the case on the theory that that would support Mr. Sherman's propensity for violence when self-defense has been raised in this case and his propensity to be the first aggressor."[1]  Post-conviction counsel observed that at the time defense counsel made the request, self-defense had not yet been raised by the proof.  The trial court told counsel that it would address the issue after self-defense had been raised.  Trial counsel, however, did not raise the issue after defense witnesses presented proof supporting the theory of self-defense.  Post-conviction counsel noted that on appeal, trial counsel complained that the trial court erred by not allowing him to use the victim's prior convictions as character evidence pursuant to Rule 404; however, this court deemed the issue waived because it was not raised by trial counsel at the appropriate time.  Post-conviction counsel asserted that the character evidence would have corroborated the petitioner's claim that the victim was a drug dealer who carried a gun and that the victim was the first aggressor.

The State responded that the proof at trial reflected that Davis and Street had been intimidated by the petitioner or the petitioner's family into saying that the victim had a gun.  The State contended that the proof adduced at trial was inconsistent with the petitioner's claim of self-defense.  The State said that even if trial counsel

> had asked for a 404(b) hearing the Court would have disallowed evidence of those pending charges anyway since

---

[1] The record reveals that, in fact, the issue was raised when the State made a motion in limine to prevent trial counsel from revealing the victim's criminal history prior to the issue of self-defense being raised.

the jury knew that Trey Sherman was a drug dealer, that he hit women, and that he carried guns and was essentially not an upstanding citizen.

The post-conviction court found:

[T]he state argues that the state itself disclosed the [victim's criminal] history to the jury in the beginning of the case, and disclosed the fact that the victim was a drug dealer and that drugs had been found on his body. The jury also heard from witnesses that a dispute arose between a female relation of the [petitioner] and the victim at an earlier time, which is why the [petitioner] went armed to the place the victim was staying, says how he saw the victim go for a gun and shot him. Although no gun was found on the victim (it is also a contention that someone got rid of the gun which was denied by witnesses, although witnesses did not deny that drugs were removed from the [victim's] body.) Additionally, proof showed that the victim did not argue with or attempt to approach the [petitioner] who was calm and the [petitioner] pulled his gun and gave chase as the victim was running away. The victim was shot in the back, multiple shots were fired where many people were assembled including children, and the [petitioner] subsequently fled and hid the weapon.

The jury was given all this information and a self-defense charge and the [petitioner] received a lesser included conviction of second degree murder from them. There is nothing to show that the standard[s for effective representation] were violated or in anyway inhibited the [petitioner's] right to a fair trial. Counsel was clearly an effective attorney in this case.

On appeal, the petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

- 13 -

The petitioner alleges that trial counsel should have pursued the admission of the victim's prior criminal arrests to corroborate his claim that the victim carried a gun and was the first aggressor. As this court noted on direct appeal:

> Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b). Nevertheless, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen et al. Tennessee Law of Evidence § 4.04[5][c] (LEXIS publishing, 6th ed. 2011). However, pursuant to Tennessee Rule of Evidence 405(a), this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id. Evidence of the victim's character, when used solely to corroborate the defendant's claim that the victim was the first aggressor, may be admitted during the direct testimony of a witness. See State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). . . .

McAfee, No. E2010-01730-CCA-R3-CD, 2013 WL 794330, at *1-7.

We note that in his brief, the petitioner argues that evidence of the victim's "felony drug convictions . . . would have corroborated the defense contention that the victim had a reputation as a violent, dangerous person, who may have reasonably been seen as an imminent threat to the Petitioner at the time the incident occurred." However, the petitioner did not adduce proof at the post-conviction hearing, such as testimony by a knowledgeable witness, a judgment of conviction, or an arrest warrant, which would have revealed the exact nature of the victim's prior charges. Therefore, it is impossible for this court to discern the relevance, if any, of this evidence. See Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *14 (Tenn. Crim. App. at Jackson, Jan. 15, 2010); Michael Carlton Bailey v. State, No. M1999-01065-CCA-R3-PC, 2001 WL

935336 at *2 (Tenn. Crim. App. at Nashville, Aug. 17, 2001); see also State v. Copenny, 888 S.W.2d 450, 454 (Tenn. Crim. App. 1993) (stating that a victim's prior convictions and arrests for drug use were not relevant to whether the victim carried a gun).

Moreover, as the post-conviction court noted, the jury heard proof that the victim was a drug dealer, that he often carried a weapon, and that he had violently assaulted a woman earlier that day. In fact, the petitioner and two defense witnesses testified that the victim was carrying a weapon on the night in question. The post-conviction court concluded that the petitioner failed to prove that his counsel was deficient or that the petitioner suffered prejudice as a result of any alleged deficiency. We can find no proof in the record to preponderate against the post-conviction court's findings.

## III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 15 -