IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2015 Session

## STATE OF TENNESSEE v. GREGORY DALE

**Appeal from the Circuit Court for Williamson County**
**No. II-CR096740     James G. Martin, III, Judge**

_____

**No. M2014-01932-CCA-R3-CD – Filed October 19, 2015**

_____

The defendant, Gregory Dale, was convicted by a Williamson County Circuit Court jury of two counts of aggravated assault, Class C felonies, and simple assault, a Class A misdemeanor. He was sentenced to four years, suspended to supervised probation after serving one year in the county jail. On appeal, the defendant argues that the trial court erred in excluding evidence of the victim's prior violent mood swings to corroborate his claim that the victim was the first aggressor and he acted in self-defense. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Eric M. Larsen, Franklin, Tennessee (on appeal); and Robert T. Vaughn, Nashville, Tennessee (at trial), for the appellant, Gregory Dale.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jessica N. Borne and Nichole R. Dusche, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for three counts of the aggravated assault of the victim, Joy Irvin, who was his girlfriend at the time.

At trial, Officer Ben Jones with the Franklin Police Department testified that he was dispatched to the hospital emergency room on May 13, 2012, to investigate a

domestic assault. He made contact with the victim and observed that she "was severely bruised around her face and slight bruises on her arms." The victim also showed him a bruise on her right thigh. He noted that the victim's eyes were "extremely swollen" such that she could "barely see." Officer Jones turned the investigation over to Officer Jennifer Harrell.

Sergeant Eric Anderson with the Franklin Police Department testified that he also responded to the hospital emergency room and observed the victim's injuries. He noted that the victim's eyes were "extremely swollen . . . both had been blackened," and she had a variety of abrasions and contusions on her arms, neck, and thigh. After interviewing the victim, Sergeant Anderson went to the victim's apartment, the location of the assault. In the victim's bedroom, Sergeant Anderson found "a blue freezer block . . . [and] a wash cloth that [the victim] had mentioned that she utilized for her injury," as well as "a wall clock that was on the ground that had been broken to pieces." He also found an empty fifth of vodka on the kitchen table.

The victim's eight-year-old daughter ("younger daughter") testified that, on the night of the incident, she was awoken by "a beating sound" and her mother and the defendant's voices. She walked by her mother's room and saw the defendant walking toward her mother, as her mother sat on the floor near her closet yelling, "[N]o, don't." She saw the defendant hit her mother in the face. The younger daughter then went downstairs into the living room. She saw her mother and the defendant walk downstairs, and the defendant got into his truck and drove away. Before the defendant left, the younger daughter saw him "whack" a "big bar thing" at her mother's leg. The younger daughter also observed that her mother's face was covered in "[p]urple stuff" and "looked pretty bad."

The victim's eleven-year-old daughter ("older daughter") testified that she was in her bedroom on the night of the incident when she heard her mother say to the defendant, "[G]et off of me." The older daughter stated that she went to her mother's bedroom and kicked the door open, at which point she saw the defendant "banging [her] mom's head up against the floor." Her mother was "knocked out" and lying on the floor. The older daughter went downstairs and got a knife because she "was scared that [the defendant] was going to kill [her] mom." She and her sister hid in her bedroom closet. The older daughter stated that she saw the defendant hit her mother one time, and that both of her mother's eyes were black and her face was swollen. She recalled that she saw the defendant drinking vodka right before she went to bed that night. On cross-examination, the older daughter admitted that her mother slapped her one time that evening.

The victim testified that, in May 2012, she and the defendant were dating but lived separately. On May 12, the defendant came to her house with plans to take her and her

2

daughters out for Mother's Day the following day. The defendant arrived around 7:00 p.m. and brought a fifth of vodka with him. Everything was fine at first. "[H]e just drank some of his vodka and [they] talked and just did [their] normal thing." The victim sent her daughters to bed, and she and the defendant retired to her bedroom.

The victim testified that, after spending some time in her room watching TV and smoking marijuana, the defendant decided that he wanted to leave. However, the victim did not want him to go because she felt that he was too intoxicated to drive. In an effort to get him to stay, the victim convinced the defendant that they were going to have sex. She removed the defendant's pants to get his truck keys, rolled them up, and put them under her pillow. She then lay down on her bed on her stomach. The victim could tell that her actions angered the defendant. After a few minutes, the defendant yanked the victim up by her hair. She told him that she would return his pants if he would release her. He did, and she threw his pants at him.

The victim testified that the defendant was so angry that he pulled her off the bed onto the floor, put his left forearm to her throat, and started hitting the right side of her face. In an effort to get him to stop, the victim grabbed the defendant's ear and testicles. The defendant hit her about twenty times before she blacked out. When she came to, the defendant had a hold of her hair and both of her ears and was banging her head onto the floor. The defendant banged her head seven or eight times. At this point, the victim noticed her older daughter standing in the doorway of her bedroom with a kitchen knife, and the victim gestured for her to leave. The defendant then grabbed her hand and bent her fingers back, breaking her hand. After that, the defendant got dressed, and the victim demanded that he leave her house.

The victim testified that, about two minutes after the defendant walked out, she realized that he had her seizure medication. She asked him for her medication, and the defendant responded, "I hope you die, bitch." The victim then turned to go back into the house. When she did not hear the defendant's truck start, she turned back around in time to see the defendant swinging a bat at her head. She blocked and grabbed the bat with her left hand, but she could not get a good grip on it due to her hand being broken. The defendant then hit her in the right thigh with the bat, knocking her down, and then he left.

The victim testified that she called her father, and he arrived and took her to the hospital. She suffered a broken hand, bruises to her face, an injury to her nose, a large bruise on her thigh from being struck with the baseball bat, a torn retina, and bruising on her knees, left elbow, right ankle, and left shoulder.

On cross-examination, the victim recalled a doctor's appointment she had on March 29, 2012, in which she discussed with her doctor that her anti-seizure medication

was causing her to be agitated, and she was prescribed a new medication. She stated that in March, April, and May of 2012, her anti-seizure medication was making her agitated and irritable, though she did not remember it making her angry. Asked whether she was involved in an incident on May 9, 2012, at her job in which she attempted to hit a co-worker with a pan, the victim stated that she did not recall such an incident and that she would have lost her job had something like that happened. Asked if she recalled seeing her doctor on May 10, 2012, she said that she did not recall that specific visit and was thereafter shown her medical record from that date to see if it refreshed her recollection. After looking at the record, the victim said that she "was written up a few times at work, but as far as the behavioral changes, [she] d[id]n't remember." She maintained that she "remember[ed] [her] job pretty well," and she did not remember an incident on May 9th. She said that the write-ups she received were "for burnt food."

With regard to the evening of the incident, the victim estimated that the defendant drank an entire fifth of vodka between 8:00 p.m. and midnight. However, she did not see him drink the entire bottle. The victim admitted that she consumed some liquor earlier in the day of the incident, as well as had the seizure medication in her system, and was feeling ill due to the combination when she went to bed that evening. The victim admitted that, during the actual assault, she blocked the door so that the defendant could not leave but said she did so "[a]fter he beat [her] head in." The victim acknowledged that her seizure medication "was creating a problem for [her]" and causing her to do "strange things" like slap her daughter. The victim stated that she is 5'11" tall and weighs 226 pounds.

Officer Jennifer Harrell, who was employed with the Franklin Police Department at the time of the incident, testified to her involvement in the investigation in the case. Officer Harrell discussed the victim's visible injuries and said that she took photographs of them. She classified some of the victim's injuries as defensive injuries. On cross-examination, Officer Harrell stated that she did not recall the victim's initial account of the events including that the defendant had pulled her hair.

Officer Zachary Wolfe with the Franklin Police Department testified that he reported to the hospital on May 15, 2012, to take the defendant into custody. He elaborated that the defendant had been taken into custody by the U.S. Marshal's office and had been transported to the hospital due to complaints of rib pain and pain in his right hand. When Officer Wolfe made contact with the defendant, the defendant told him that the incident occurred between the hours of 11:00 p.m. on May 13 and midnight on May 14. He said that the victim had violent mood swings, and his actions were in self-defense. The defendant also mentioned an incident that occurred between the victim and a male co-worker a couple of weeks or months prior. The defendant said that the victim "became very violent" towards people when she had a mood swing. Officer Wolfe took

photographs of the injuries the defendant alleged to have received during the incident. However, the defendant did not specify what he did to the victim to defend himself or how he sustained his injuries.

Dr. Ronald Hagen, the physician in the emergency room who treated the victim, testified to the injuries he observed on the victim when he examined her and his treatment of her. Dr. Marcie Daniel, an optometrist with the Toyos Eye Clinic, testified specifically to the injuries to the victim's eyes and the treatment of said injuries.

The defendant testified on his own behalf. He said that on the date of the incident, he was fifty-two years old and weighed 210 pounds. His medical history included nerve damage in his left hand and pelvic and vertebral problems stemming from a car accident. He testified about the history of his relationship with the victim and that, during the course of their relationship, he was living with another woman. He said that he provided financially for the victim and her children during the course of their relationship.

The defendant testified that he accompanied the victim to her doctor's appointments "numerous times." He observed the victim suffer a seizure on more than one occasion. He recalled that on March 29, 2012, he went with the victim to an appointment with Dr. Schwab and afterward to the pharmacy to have medications filled. He attended another doctor's appointment with the victim on April 4, 2012, but he did not recall taking her to the pharmacy after that visit. He attended another doctor's appointment with the victim on May 10, 2012, and accompanied her to the pharmacy afterward to have medications filled.

The defendant testified that beginning in March 2012, he noticed the victim becoming "very moody, easily agitated, [and] verbally abusive" – a change from her prior behavior. The victim spoke of going back to the doctor to see if she could get a different medication. The defendant stated that he maintained possession of one of the victim's medications to prevent her from abusing them and would dole it out when needed. On May 9, 2012, he received a phone call from the victim which caused him to go to her house after work and, when he arrived, the victim was "very angry, highly aggressive."

On May 12, 2012, the date of the incident, the defendant arrived at the victim's home around 7:30 p.m., and he brought with him a half-full bottle of vodka and tomato juice. He also brought some Primatene tablets for the victim because she was having an asthma attack. When he arrived, he could sense tension in the house, and the victim was not feeling well. The defendant saw the victim take the Primatene tablets and then go upstairs to lie down, complaining of a headache. However, before the victim went

5

upstairs, the defendant saw the victim slap her older daughter "real hard" after an argument. He had never seen the victim do that before.

The defendant testified that he remained downstairs watching television until 8:00 or 8:30 p.m. and then went upstairs to the victim's bedroom. He found the victim lying on her back and staring at the ceiling, apparently in pain. He asked her several times if she was all right but got no response. He was finally able to rouse her by tapping her on the head. When the victim came to, she wanted to smoke marijuana and they did so together. He remained upstairs with the victim for about a half-hour before going back downstairs to continue watching TV.

The defendant testified that he went upstairs approximately three additional times throughout the evening to check on the victim. He was drinking mixed drinks during this time but only had two drinks the entire night. He went upstairs around 11:30 p.m., removed his clothes, and got into bed without waking the victim. He fell asleep but woke up around 2:00 a.m. to use the bathroom. When he returned, the victim was breathing normally, so he decided to leave. He began to dress, but, when the victim awoke and discovered that he was leaving, she grabbed his pants and put them behind her pillow. She pleaded with him to stay.

The defendant testified that the victim eventually threw his pants at him. After he put on his pants, the victim closed the bedroom door and blocked it with her body. He asked the victim to move, and then a struggle ensued as he attempted to push her out of the way. The victim got out of his way, but he did not leave immediately, staying to put on his boots. The defendant claimed that, while he was putting on his boots, the victim charged him and pinned him against the wall. He said that the victim tried to hit him, and he blocked the blows. She eventually grabbed his testicles and squeezed very hard. He said that the victim was very strong, and he was afraid. He pushed the victim away and "head butted" her in the nose, and she released the grip on his testicles.

The defendant testified that he tried to get out of the bedroom, but the victim charged at him and grabbed his testicles again. They wrestled, and he landed on top of her. The victim still had a hold of his testicles and also grabbed his ear, trying to rip it off. The defendant hit the victim approximately ten times on the left side of her head in an attempt to get away from her, but he did not hit her in the face. He thought the victim's black eyes were from his "head butting" her. The defendant denied that he tried to strangle the victim. However, he might have used one of his arms across the victim's chest to try to push her back. He also denied snapping the victim's fingers back and speculated that the injury must have happened when they fell. The victim eventually let go of him, and he left. He never saw the victim's older daughter enter the bedroom.

6

The defendant testified that he managed to get in his truck and start it before he saw the victim coming toward him with her hand down beside her leg as though carrying something. He got out of the truck so he could hear what the victim was saying to him, but, when he saw her hand move, he kicked her in the right leg and possibly in the hand, fearing that she was going to stab him. However, he admitted that he did not see a knife. He then left in his truck. He denied having a baseball bat in his truck.

Officer Jones was recalled by the defendant and testified regarding his conversation with the victim's two daughters at the hospital. He said that the younger daughter told him that she was asleep during the incident and did not see anything.

Following the conclusion of the proof, the jury convicted the defendant of two counts of aggravated assault, as charged, and one count of the lesser-included offense of simple assault, a Class A misdemeanor.

## ANALYSIS

The defendant argues that the trial court erred in denying evidence of the victim's prior violent mood swings to corroborate his claim that the victim was the first aggressor and he acted in self-defense.

Before trial, defense counsel sought permission to question the victim and the defendant about statements made to the victim's doctor, in the defendant's presence, as well as findings by the doctor contained in the victim's medical records. The defendant asserted that reference was made to the victim's having problems with her medications and having mood swings, which was "very relevant in laying ground work coming up to the conduct" on the day of the incident. The court reserved ruling on the issue until it came up at trial.

Thereafter, during the trial, defense counsel sought to question the victim about some of her doctor's appointments that took place before the incident. Defense counsel explained that he wanted to establish that the defendant attended those appointments with her and that they discussed her seizures and problems with her medications during those appointments, as well as the side effects of the medication that could affect the victim's conduct. The defense's theory as to the relevance of such information was that the victim had "a medical-induced problem that made her more likely than not to become either angry or having mood swings or to become violent." The trial court allowed the defense to ask the victim if she had a seizure and what happened to her when she did. The defense was able to elicit from the victim that, at the time of her doctor's visit on March 29, 2012, she had been taking Sumagran, but it was causing her to be agitated.

7

Therefore, after that visit, she stopped taking Sumagran and started taking Klonopin instead.

The defense asked the victim about an incident at her job a few days before the incident in this case in which she attacked another employee, "Dave." The victim did not recall the incident, even after the defense attempted to refresh her memory. The trial court also permitted the defense to ask the victim about a series of text messages she received from "Dave" on the day of the incident in this case to establish "a pattern of anger and getting more angry as time went on that day." However, the victim did not recall the text messages. The defense was able to establish that the victim's medication was creating problems for her and causing her to behave in uncharacteristic ways, such as slapping her child. The defense was also able to establish that the victim may have texted her father after the incident with the defendant, saying "I've been a bad girl and I got what I deserved." On redirect examination, the victim testified that the Lamictal she was taking at the time of the incident made her agitated and moody but not violent.

During the defendant's testimony, defense counsel sought to ask him about a call from the victim on May 9, 2012. The court did not permit counsel to ask about the substance of the call, as it would be hearsay not subject to any exception, but said that he could testify about what he did as a result of the call. Defense counsel explained to the court that he wanted to elicit from the defendant that the victim told him that "[a]ggression that occurred . . . at her work between she and another individual . . . caused her to be sent home that day." Defense counsel said that the testimony was relevant to show the victim's mood swings, aggression, and anger. The court said that it would not allow the defendant to testify about an incident he did not witness.

The defense was able to elicit from one of the testifying police officers that the defendant said that the victim had violent mood swings and that his actions were in self-defense.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under

one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. One such exception is the state of mind exception, which provides for the admission of a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Tenn. R. Evid. 803(3). Questions regarding the relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b). However, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[5][d] (5th ed. 2005). Yet, pursuant to Tennessee Rule of Evidence 405(a), this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id.

If the issue of first aggressor has first been raised by the evidence, proof of the victim's prior violent acts may be admissible through the direct examination of a witness for the purpose of corroborating the defendant's claim of self-defense. See State v. Ruane, 912 S.W.2d 766, 779-80 (Tenn. Crim. App. 1995); State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Before admitting proof of first aggression, however, the trial court must determine that the following conditions are satisfied:

1. Self-defense must be raised by the proof and not by the words and statements of counsel.

2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression.

3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781.

In this case, there were essentially two categories of proof the defendant wished to introduce: testimony concerning what the victim told her doctor during the appointments the defendant attended with her about the effects of her medication, and testimony from

9

the defendant concerning what the victim told him regarding an altercation with a co-worker a few days prior to the incident in this case. The defendant asserts that the testimony should have been admissible to prove the victim's state of mind and to support that his actions were in self-defense.

The trial court properly barred the defendant from testifying about the victim's statement to him regarding an incident with her co-worker because the allowance of such testimony would violate Rule 405 of the Tennessee Rules of Evidence. When evidence of a victim's character trait is permitted to establish that the victim was the initial aggressor, the method of proving the victim's character trait is governed by Rule 405 and only admissible as part of the defendant's cross-examination of the victim. See State v. Ray, 880 S.W.2d 700, 705-06 (Tenn. Crim. App. 1993).

The other problem with the defendant's assertion is that he sought to elicit testimony concerning the victim's being in a state of agitation out of sequence, in that he had not yet testified to raise the issue of self-defense and that the victim was the first aggressor. The first hint of self-defense came from Officer Wolfe's testimony, but Officer Wolfe testified *after* the victim, and the defendant first tried to elicit such proof *during* the victim's testimony.

With regard to the victim's statements to her doctor regarding problems with her medication, we note that the defendant was able to question the victim on cross-examination about her doctor's appointments and she acknowledged that her anti-seizure medication was making her agitated and irritable – the exact behavior the defendant sought to show.

In any event, even if the court erred in excluding all or some of the evidence, such error was harmless. The defendant was able to introduce a substantial amount of proof concerning the victim's history of violence and mood swings. The defense was able to establish that the victim's medication was creating problems for her and making her behave in uncharacteristic ways, such as slapping her child on the night of the incident. The defense was able to establish that the victim may have texted her father after the incident, saying, "I've been a bad girl and I got what I deserved." The defense was able to elicit from one of the testifying officers that the defendant told him that the victim had violent mood swings. In addition, the defendant testified that beginning in March, he noticed the victim becoming very moody, easily agitated, and verbally abusive – a change from her prior manner.

Moreover, from the photographs introduced, the jury saw evidence of the severity of the victim's injuries compared to those sustained by the defendant, which militates against an assertion that the defendant was merely acting in self-defense.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE